*Valerie Rovin v. State of Maryland*, No. 19, September Term, 2023, Opinion by Booth, J.

**MARYLAND COMMON LAW CLAIMS OF FALSE ARREST, FALSE IMPRISONMENT, AND MALICIOUS PROSECUTION, AND ASSOCIATED CONSTITUTIONAL CLAIMS ARISING UNDER ARTICLES 26 AND 24 OF THE MARYLAND DECLARATION OF RIGHTS.**

Petitioner was arrested pursuant to a warrant for violating the juror intimidation statute, Md. Code Ann., Criminal Law Article § 9-305 (2021 Repl. Vol.).  At the conclusion of Petitioner's bench trial, the circuit court acquitted her based upon its interpretation of the statute.  Petitioner brought a civil suit against a sheriff's deputy, alleging that by filing an application for statement of charges, and causing her arrest pursuant to a warrant, he was civilly liable under the common law torts of false arrest, false imprisonment, and malicious prosecution, and that he violated her rights under Articles 24, 26, and 40 of the Maryland Declaration of Rights.  The deputy filed the application for statement of charges after consulting with the State's Attorney's Office and relying on the determination by that office that Petitioner's conduct violated the statute.

The Supreme Court of Maryland held that the circuit court did not err in entering summary judgment in favor of the State on the common law claims of malicious prosecution, false arrest, and false imprisonment, and on the claims alleging violations of Article 24 and Article 26 arising from the same conduct, under circumstances in which the deputy arrested the plaintiff pursuant to a warrant that was issued by a neutral judicial officer.

When an arrest is made pursuant to a warrant, probable cause is predetermined by a judicial officer.  The issuance of a warrant by a neutral issuing judge or judicial officer creates a strong presumption that it was objectively reasonable for police officers to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on a lack of probable cause faces a heavy burden.  *See Messerschmidt v. Millender*, 565 U.S. 535 (2012).  Although a warrant is not an absolute shield, civil liability will arise only in circumstances in which "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* at 547.  In order to overcome the presumption of objective reasonableness that attaches to a warrant, the plaintiff must demonstrate that: (1) the judicial officer issuing the warrant was misled by an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) the judicial officer wholly abandoned his or her judicial role; (3) the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; *or* (4) when the warrant is so facially deficient that the executing officers cannot reasonably presume it to be valid.  The application of these principles is based upon the "sound presumption" that the judicial officer is more qualified than the law enforcement officer to make a probable cause determination.

In addition to the strong presumption of probable cause that attaches to a warrant, when an officer obtains and follows legal advice from a prosecutor when applying for a statement of charges after presenting a full and fair disclosure of everything that was presented to the officer, there is "further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." *See Messerschmidt*, 565 U.S. at 553.

Applying the above principles, the Supreme Court of Maryland held that the circuit court did not err in entering summary judgment in favor of the State on counts alleging false arrest (Count I), false imprisonment (Count II), malicious prosecution (Count III), and violations of Article 26 (Count VI) and Article 24 (Count IV) (as that count pertains to conduct alleging false arrest, false imprisonment, and malicious prosecution). Petitioner was arrested pursuant to a warrant issued by a neutral judicial officer after the deputy who obtained the warrant sought legal advice from the State's Attorney's Office. As a matter of law, Petitioner cannot overcome the strong presumption of probable cause that attached to the warrant in the circumstances presented. The Court determined that the application for statement of charges was based upon an objectively reasonable interpretation of the juror intimidation statute, and thus probable cause and legal justification existed for Petitioner's arrest and imprisonment.

**MARYLAND DECLARATION OF RIGHTS — ARTICLE 40.** The Supreme Court held that the circuit court did not err in granting summary judgment in favor of the State on Petitioner's claim that her arrest and imprisonment violated her free speech rights under Article 40 (Count V) and Article 24 (as it related to the free speech claim). Based upon its examination of the application for statement of charges that was presented to the neutral judicial officer, the Supreme Court held that the judicial officer had probable cause to believe that Petitioner's speech constituted a "true threat" and fell outside the protections of Article 40. The Court held that the presence of probable cause defeated any Article 40 claim arising from Petitioner's arrest and imprisonment.

**MARYLAND DECLARATION OF RIGHTS — ARTICLE 24 — CHALLENGE TO CONSTITUTIONALITY OF JUROR INTIMIDATION STATUTE.** The Supreme Court of Maryland held that the circuit court did not err in entering summary judgment in favor of the State on Petitioner's Article 24 (Count IV) claim to the extent that she alleged that Maryland's juror intimidation statute, Md. Code Ann., Criminal Law Article § 9-305 (2021 Repl. Vol.), is unconstitutionally vague.

Circuit Court for Wicomico County
Case No.: C-22-CV-17-000326
Argued: February 6, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 19

September Term, 2023

VALERIE ROVIN

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

Opinion by Booth, J.
Watts, J., dissents.

Filed: August 15, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This is the second appearance of this case before this Court. In this instance, we are asked to determine whether the State may be subject to civil liability for an arrest under circumstances in which, after interviewing a victim, a deputy obtained legal advice from the State's Attorney's Office that there was probable cause to believe that an individual had committed a statutory criminal offense, a judicial officer found probable cause to issue a warrant, and thereafter a trial judge acquitted the individual of the charge based upon the trial judge's interpretation of the statute in question.

The issues presented in this case arise in the context of Petitioner, Valerie Rovin's, arrest and prosecution for violating the juror intimidation statute, Md. Code Ann., Criminal Law Article ("CR") § 9-305 (2021 Repl. Vol.). Ms. Rovin, upset by a jury's verdict rendered against her daughter in a criminal trial, went to the jury foreperson's workplace on the same day to confront him about the verdict. According to the foreperson, Ms. Rovin yelled at him, acted in an aggressive and threatening manner, and told him, among other things, that she was going to have an individual from Nicaragua "take care of him." The foreperson immediately reported this exchange to the Sheriff's Office. The deputy sheriff who investigated the matter consulted with prosecutors in the State's Attorney's Office, who advised the deputy that Ms. Rovin's conduct violated the juror intimidation statute. Thereafter, the deputy applied for a statement of charges. A District Court Commissioner determined that there was probable cause to issue a warrant for Ms. Rovin's arrest.

At the close of the State's case at Ms. Rovin's bench trial, her counsel moved for a judgment of acquittal, arguing that her conduct did not constitute juror intimidation under the statute because Ms. Rovin's daughter's criminal trial had concluded, and thus the

foreperson was no longer serving on a jury and his service had concluded. The State disagreed with Ms. Rovin's narrow interpretation of the statute and argued that the foreperson's jury service was for the period of his summons, and that as a result of Ms. Rovin's actions, the foreperson was dismissed from his jury service early. The circuit court determined that although Ms. Rovin's actions were "very improper" and may have been evidence of juror "retaliation," her actions did not fit within the conduct prohibited by the juror intimidation statute, and it therefore entered a judgment of acquittal.

Ms. Rovin then filed a civil suit against, among others, the State's Attorney and Assistant State's Attorney who advised the deputy and subsequently prosecuted her, and the deputy who applied for the charges and sought a warrant for her arrest. She asserted that the defendants, through their conduct in causing her arrest and prosecution, committed common law torts and violated her rights under various articles of the Maryland Declaration of Rights. After the circuit court entered judgment in favor of the defendants and the matter was appealed to the Appellate Court of Maryland, this Court granted *certiorari* to determine, among other things, whether absolute immunity barred the claims.

With respect to the claims against the prosecutors, we held that the circuit court was correct in entering summary judgment in their favor because they were entitled to absolute immunity. *State v. Rovin*, 472 Md. 317 (2021). We determined that the immunity extended not only to the prosecutors' decision to prosecute, but also to their conduct in advising the deputy prior to the filing of the application for statement of charges. *Id.* at 355–56. Although we held that the State could not be civilly liable for the actions of the prosecutors

2

(and after declining to extend prosecutorial immunity to the deputy's conduct), for the reasons discussed more fully herein, we declined to decide whether the State could be civilly liable for the deputy's conduct in applying for charges and obtaining an arrest warrant under these circumstances. We remanded the case to the circuit court. On remand, the circuit court entered summary judgment in the State's favor, ruling that "neither the [deputy nor the sheriff] can be civilly liable for [Ms. Rovin's] arrest pursuant to a warrant based upon a judicial officer's determination that probable cause existed for said arrest even though that determination was later held by a trial court to be based upon an error of law." After the Appellate Court of Maryland affirmed the judgment in the State's favor, Ms. Rovin filed a petition for writ of *certiorari*. For the reasons set forth herein, we affirm the judgment of the Appellate Court.

# I

## Background

### A.     *The Criminal Case Against Ms. Rovin's Daughter*

The proceedings in this case arose after Ms. Rovin's daughter was convicted of driving under the influence of alcohol and related traffic offenses in the Circuit Court for Wicomico County in June 2015.[1] Ms. Rovin's daughter received a sentence that included jail time. Ms. Rovin attended a portion of her daughter's trial. On the same day the jury

---

[1] *State v. Bailey*, No. 22-K-15-000171 (Md. Cir. Ct. Wicomico County, June 16, 2015).

3

convicted Ms. Rovin's daughter, Ms. Rovin located the jury foreperson at his workplace and confronted him about the verdict.

According to Ms. Rovin's complaint, she had met the foreperson approximately one year prior to the trial. They discussed the fact that they had the same last name, as well as the possibility that they shared a common relative, Bill Rovin, who had moved to Nicaragua. Ms. Rovin indicated, however, that to her knowledge, she and the foreperson were not related. The complaint also alleges that the foreperson and one of Ms. Rovin's daughters were Facebook friends.[2]

After Ms. Rovin left the foreperson's workplace, he reported the incident to the Wicomico County Sheriff's Office. Deputy Sheriff Matthew Cook responded to the call. Ms. Rovin disputes what was said during her conversation with the foreperson. She does not, however, appear to dispute what the foreperson told the deputy. The foreperson reported that Ms. Rovin behaved erratically and aggressively, caused a commotion, and appeared to be outraged by the foreperson's decision to convict Ms. Rovin's daughter. The foreperson told Deputy Cook that Ms. Rovin invaded his personal space to the point that he felt very "uncomfortable and threatened." The foreperson also stated that Ms. Rovin told him that she would have "Bill Rovin" "take care of him[.]" The foreperson did not know Bill Rovin, and when he asked who Bill Rovin was, Ms. Rovin told him that Bill

---

[2] Ms. Rovin's daughter who was convicted of the DUI and related traffic offenses was not the same daughter with whom Mr. Rovin was Facebook friends. Ms. Rovin does not suggest that the foreperson knew Ms. Rovin's daughter who was convicted.

Rovin worked in Nicaragua and had people who could "take care of" him. The foreperson interpreted this as a threat and alerted the police.

### B.       *The Criminal Case Against Ms. Rovin*

Officers of the Wicomico County Sheriff's Office consulted with the Wicomico County State's Attorney's Office and were advised that Ms. Rovin's conduct constituted juror intimidation under CR § 9-305 and that she should be charged accordingly. Under that statute, "[a] person may not, by threat, force, or corrupt means, try to influence, intimidate, or impede a juror, a witness, or an officer of a court of the State or of the United States in the performance of the person's official duties." CR § 9-305(a).

Around the same time, the foreperson applied for a peace order against Ms. Rovin and gave sworn testimony in the District Court of Maryland, sitting in Wicomico County. He stated that he was a member of a jury that convicted Ms. Rovin's daughter and that Ms. Rovin came to his workplace and threatened to harm to him. Specifically, he testified that Ms. Rovin threatened that she would have "somebody come in from out of town" to harm him and that "she told [him] she was going to contact somebody who was going to send people . . . to take care of [him] . . . people from Nicaragua where Bill Rovin lives." The judge explained to the foreperson that he was unable to obtain a peace order because the statutory requirements were not satisfied.[3] The foreperson testified that the State's Attorney's Office had advised him to apply for the peace order. The judge informed the

---

[3] Md. Code Ann., Courts and Judicial Proceedings Article ("CJ") § 3-1503 (1984, 2021 Repl. Vol., 2022 Supp.) identifies the grounds for which a peace order may be obtained.

foreperson that "there's a statute, it's a criminal offense to intimidate a juror[,]" and "if [Ms. Rovin] has done what you say she has done, that may very well be a criminal offense."

After that hearing, Deputy Cook applied for a statement of charges against Ms. Rovin. Among other things, the application recited the information provided by the foreperson. It also stated that the Wicomico County Sheriff's Office had consulted with the State's Attorney's Office, and that office "believed" that this was a case of juror intimidation under CR § 9-305(a) "and should be charged accordingly." The application further stated that the foreperson "was assigned as a [j]uror for the [Circuit Court for] Wicomico County for the month of June 2015 and had to be discharged from further duty as a result of this incident."

A District Court Commissioner agreed that there was probable cause that Ms. Rovin violated CR § 9-305 and, consequently, issued a warrant for her arrest. Ms. Rovin was arrested on June 18, 2015. She was held for one day, after which she was placed under house arrest. In July 2015, the State's Attorney's Office filed a criminal information charging Ms. Rovin with intimidating a juror in violation of CR § 9-305(a) and second-degree assault. Thereafter, Ms. Rovin remained on house arrest for approximately four months until her trial commenced.

Ms. Rovin was tried in a bench trial in the Circuit Court for Wicomico County. The record in this case includes only very limited portions of the transcript of her criminal trial.[4]

---

[4] Specifically, the record includes two pages of the foreperson's testimony, counsels' legal arguments on the defense's motion for acquittal at the end of the State's case, and the court's ruling on the motion. The transcript reflects that the State called

6

The foreperson testified that Ms. Rovin came to his workplace "in an extreme state of agitation[,]" started yelling at him, and asked him how he could "put another Rovin in jail[.]"  The foreperson testified that the building included a preschool program and that there were "probably over 100 kids in the building at that time, so [he] wanted to escort her away" from the public area and asked her to come to his office.  After being escorted into the foreperson's office (which had a double glass door, making the area visible to the public), the foreperson testified that Ms. Rovin "continued yelling" at him "for putting her daughter in jail[.]"  According to the foreperson, the yelling continued, and Ms. Rovin told him that "Bill Rovin . . . in Nicaragua" would take care of him.  The foreperson testified that after Ms. Rovin left his office, he googled Bill Rovin "and saw that he had business dealings in Nicaragua" and, therefore "knew in [his] mind[,] it was a valid threat."

At the close of the State's case, Ms. Rovin moved for an acquittal, arguing that, on both the evidence presented at trial and the law, she did not commit either offense with which she was charged.  Pertaining to the second-degree assault charge, Ms. Rovin's counsel argued that the evidence failed to prove that any threat Ms. Rovin made against the foreperson rose to the level of an imminent battery.  Specifically, Ms. Rovin's counsel argued that although his client was "yelling," "being rude," and that her conduct was "distasteful," such conduct did not put the foreperson in fear of imminent offensive physical contact or harm.  With respect to Ms. Rovin's statement that "Bill Rovin from Nicaragua" would "send someone to take care of" the foreperson, defense counsel argued

---

several witnesses, including Deputy Cook.  However, those portions of the transcript are not part of this record.

7

that having someone "come from Nicaragua and take care of him" "is the antithesis of immediate and imminent."

As for the juror intimidation charge, Ms. Rovin's counsel argued that the court should interpret the statute very narrowly, focusing on the fact that the trial had concluded when Ms. Rovin confronted the foreperson at his workplace and, therefore, her conduct could not have influenced an ongoing proceeding. Ms. Rovin's counsel argued:

> What [the juror intimidation] statute says is a person may not by threat, force or corrupt means try to influence, intimidate or impede a juror in the performance of the person's official duties. . . . [Here,] they had already found [Ms. Rovin's daughter] guilty. There was not a pending judicial proceeding, no pending trial. [The foreperson] had already completed his official duty . . . and there is no way that she could have influenced that verdict, which was over.
>
> *   *   *
>
> She had to attempt to influence a juror in the performance of his official duties. She did not have that intent because she couldn't have any influence on his official duties. Just because [a circuit court judge] decided that he should not serve on any future juries does not mean that my client was trying to cause that result. She went there to criticize him for finding her daughter guilty, and according to [the foreperson] to threaten that somebody else would come and do harm. But she wasn't trying to [affect] the outcome of the trial[.]
>
> *   *   *
>
> [A]t best you could consider her conduct [as] a threat of retaliation against [the foreperson] for a prior verdict. . . . She was just voicing her opinion, granted in a way she shouldn't have, everybody knows that. But it did not amount to a crime. I think she understands better than anybody she shouldn't have done this, but the bottom line is she didn't commit a crime[.]

The State disagreed with Ms. Rovin's counsel's "extremely narrow reading" of the juror intimidation statute, which limited a juror's "official duties" to "simply sitting on a single jury." The State pointed out that sworn jurors are "under the [c]ourt's subpoena for 30 days[,]" and that as a result of Ms. Rovin's conduct, the foreperson was dismissed from

8

his official duties as a sworn juror on June 17—prior to the expiration of his juror service on June 30.

The court questioned how Ms. Rovin was "trying to get this particular juror to take any action[.]" The court observed that Ms. Rovin's conduct was "not proper," and "shouldn't have been done," but expressed its view that her conduct did not appear to violate the statute. The prosecutor disagreed, stating:

> [B]y intending to intimidate him, which she certainly did, to stalk out, find the [foreperson's] name . . . go there and make that threat, I think she absolutely intended to intimidate him. The natural and probable consequence . . . was that he was unable to serve the rest of the month, he couldn't possibly be a fair juror for the rest of the month. Whether she intended that result, the State argues, is irrelevant; it's whether she intended to intimidate him. If she intended to intimidate him[,] she is responsible for the natural and probable consequences of her actions.

In response to the court's question as to whether Ms. Rovin intended to intimidate the foreperson in connection with his official duties as a juror, the prosecutor noted that under the testimony presented to the court, "[a] juror's official duties extend 30 days." The prosecutor further explained that the State's interpretation of the statute required the court to determine whether "a reasonable juror who . . . had this occur could perform, could be reasonably expected to be fair and impartial, which is [a juror's] official duties for the rest of the month."

After considering these arguments, the trial court agreed with Ms. Rovin's counsel's characterization of the evidence—that Ms. Rovin merely sought to "retaliate" against the foreperson for the prior verdict, rather than attempting to convince him to take some action to affect the verdict. The court stated that "the evidence here is of a retaliation for

9

something that was already done, which is improper, but not in violation of [CR § 9-305]."

The court then granted Ms. Rovin's motion, stating:

> Well, I think this is a very difficult case. I think [Ms. Rovin's] actions were very improper.
>
> * * *
>
> As far as the violation of [CR § 9-305], I think this should be a violation of the law to intimidate or threaten a juror for something they have already done, but that's not what this statute does. It's to prevent somebody from impeding an ongoing judicial process, to [a]ffect the outcome of the case, or something of that nature. It's not to retaliate for something that a juror has done in the past.
>
> * * *
>
> I think the actions that have been testified to as to the Defendant if they are true are wrong and should not have been performed, but I don't think they violate [CR §] 9-305, and the Court's going to grant the Defendant's motion.

As to the second-degree assault charge, the court acquitted Ms. Rovin because "the threat of doing something to somebody at some time in the future is not by legal definition an assault."

### C. Ms. Rovin's Civil Case Against the State

#### 1. Rovin v. State – Part I

Following her acquittal, Ms. Rovin sued the State, the prosecutors, and law enforcement officers[5] who were involved in her criminal charges and prosecution, alleging, among other things, that the defendants' conduct in causing her arrest and prosecution gave rise to civil liability under various common law torts, and violated her rights under Article

---

[5] In addition to the State, Ms. Rovin named the following individuals as defendants: Wicomico County State's Attorney Matthew Maciarello, Assistant State's Attorney Richard Brueckner, Sheriff Michael Lewis, Deputy Sheriff Matthew Cook, the Wicomico County State's Attorney's Office, and the Wicomico County Sheriff's Office.

24 of the Maryland Declaration of Rights. Specifically, the initial complaint alleged seven counts: false arrest (Count I), false imprisonment (Count II), malicious prosecution (Count III), violation of Article 24 of the Maryland Declaration of Rights (Count IV), false light invasion of privacy (Count V), defamation (Count VI), and intentional infliction of emotional distress (Count VII).

The defendants filed a motion for summary judgment, which the circuit court granted. The Appellate Court of Maryland reversed in an unreported opinion, holding that summary judgment was not appropriate because, among other things, Ms. Rovin's claims against some of the individual defendants required a showing of malice or gross negligence to proceed, pursuant to State personnel immunity under the Maryland Tort Claims Act ("MTCA"), and Ms. Rovin may have needed discovery to prove those elements.[6] *Rovin v. State*, No. 233, Sept. Term, 2018, 2020 WL 3265119, at \*9 (Md. Ct. Spec. App. June 17, 2020).

We granted *certiorari* and reversed the judgment of the Appellate Court in part. *State v. Rovin*, 472 Md. 317 (2021) ("*Rovin I*").

---

[6] The Maryland Tort Claims Act ("MTCA"), Md. Code Ann., State Government Article ("SG") § 12-101 *et seq.* (1984, 2021 Repl. Vol., 2022 Supp), provides statutory immunity for "State personnel" from suit for any tortious act or omission committed, so long as the individual was acting within the scope of his or her public duties without malice or gross negligence. *See* SG § 12-105; CJ § 5-522(b). The MTCA identifies the various individuals who qualify as "State personnel," including sheriffs and deputy sheriffs. SG § 12-101(a)(6). The Act provides a concomitant waiver of State immunity, subject to certain monetary and other limitations, where the Act provides State personnel immunity. Under this framework, the State may be liable (up to a certain amount) when State personnel immunity applies but retains its immunity when State personnel may be liable in their individual capacities because they acted with malice or gross negligence, or because they acted outside the scope of their public duties. *See* SG § 12-104; CJ § 5-522.

11

Aside from the false light invasion of privacy and defamation counts, which were not before us,[7] we held that summary judgment was proper on the claims filed against the individual defendants. Concerning the claims against the State's Attorney and Assistant State's Attorney, we held that the circuit court was correct in granting summary judgment in their favor because they were entitled to prosecutorial immunity—an absolute immunity—and, therefore, the State could not be held civilly liable for their actions in this case. *Rovin I*, 472 Md. at 349. We also held that the prosecutors were entitled to prosecutorial immunity not only for prosecuting Ms. Rovin, but also for their conduct in advising Deputy Cook to institute charges against her.[8] *Id.* at 355. Specifically, we explained that "prosecutorial immunity applies where a prosecutor advises a law enforcement officer to file with a judicial officer an application for a statement of charges as this is an act related to the decision of whether to prosecute and an act closely associated with the prosecutor's role in the judicial process." *Id.* at 355–56.

As for the claims against the law enforcement officers, Deputy Cook argued that we should extend prosecutorial immunity to his acts because he relied on the advice given by

---

[7] After Ms. Rovin's arrest, law enforcement officers made statements about Ms. Rovin's arrest and her conduct. These statements relate to Ms. Rovin's counts for false light invasion of privacy and defamation. In *Rovin I*, the State did not raise in its petition for writ of *certiorari* that portion of the Appellate Court's judgment reversing the trial court's grant of summary judgment on Ms. Rovin's counts of false light invasion of privacy and defamation. This Court's reversal of the Appellate Court's judgment did not extend to those counts. *State v. Rovin*, 472 Md. 317, 331, 334 (2021) ("*Rovin I*").

[8] Moreover, we made clear that, although Ms. Rovin also included both the Wicomico County State's Attorney's Office and the Wicomico County Sheriff's Office as defendants in her complaint, neither office was "a legal entity subject to suit[.]" *Rovin I*, 472 Md. at 329 n.3; *see also id.* at 339 n.9.

the prosecutors, namely, that there was probable cause to believe that Ms. Rovin violated the juror intimidation statute. We did not accept Deputy Cook's invitation to extend prosecutorial immunity to law enforcement officers who consult with prosecutors, *id.* at 356, observing that we had "never made any form of absolute immunity generally applicable to actions by law enforcement officers, and we decline[d] to do so [t]here[,]" *id.* at 362.

Although we declined to extend absolute immunity to the law enforcement officers' conduct, we held that they were entitled to State personnel immunity under the MTCA. *Id.* at 330–31. Based upon her pleadings, we observed that Ms. Rovin did not allege that any of the individual defendants "acted with the malice or gross negligence required to defeat State personnel immunity." *Id.* at 363.

In the last eight pages of our opinion, we discussed an issue of first impression raised by the State—"whether liability can attach to an officer who makes an arrest based on a reasonable, good faith belief that the conduct in question was criminal after conferring with prosecutors and obtaining a warrant from a District Court Commissioner." *Id.* at 365. In arguing that it should not be civilly liable in this case, the State relied on the United States Supreme Court's decision in *Heien v. North Carolina*, 574 U.S. 54 (2014), in which the Court held that there is no violation of the Fourth Amendment when a law enforcement officer initiates a traffic stop on reasonable suspicion that is based on an objectively reasonable mistake of law. We discussed the State's contentions pertaining to *Heien*. We also noted that in the context of common law claims for malicious prosecution, the probable cause necessary to defeat such a claim typically exists when a layperson relies upon the

13

advice of an attorney, including a prosecutor, that the conduct constitutes a crime, even if that advice is mistaken. *Id.* at 367–73 nn.15–16 (citing Restatement (Second) of Torts § 662 (Existence of Probable Cause) (1977), Restatement (Third) of Torts § 22 (Probable Cause to Initiate Criminal Proceedings)).

After discussing these principles, we declined to apply them because they were raised for the first time on appeal. *Id.* at 373. Instead, we returned "the case to the circuit court for a determination as to whether *Heien* is applicable to the circumstances of this case." *Id.* Having determined that the officers were "not entitled to absolute judicial or prosecutorial immunity[,]" we remanded the case to the circuit court, stating that "all of the claims in the complaint against the State based on the alleged actions of the officers remain[.]" *Id.* at 374. In a concurring opinion, Judge McDonald stated that, although he had "no problem with a disposition that sen[t] the case back to the circuit court," he believed that the Court could address the legal issue of whether the State could be liable for an "asserted error of law" without remanding the case to the circuit court. *Id.* at 375 (McDonald, J., concurring). In his view, it was not the deputy's role to second-guess the prosecutors' legal advice to file the warrant application or the District Court Commissioner's decision to issue the warrant, and he would have affirmed the grant of summary judgment in favor of the State on that basis.[9]

---

[9] Judge McDonald observed that these claims "turn[ed] on whether the deputy sheriff who arrested Ms. Rovin was at fault for executing the arrest warrant based on an error of law." *Rovin I*, 472 Md. at 375 (McDonald, J., concurring). Judge McDonald summarized his conclusion regarding the asserted error of law in this case, stating:

14

### 2. *Rovin v. State – Part II*

After the case was remanded, Ms. Rovin amended her complaint.[10] She did not modify her allegations with respect to gross negligence or malice, but she did add additional counts against the State (the sole remaining defendant)[11] thus alleging eight counts in total: false arrest (Count I), false imprisonment (Count II), malicious prosecution (Count III), and claims under Articles 24, 40, and 26 of the Maryland Declaration of Rights (Counts IV, V,

---

> The asserted error of law relates to the breadth of the juror intimidation statute ([CR] § 9-305) at the time that the warrant was issued and executed. Several lawyers and judicial officers—the District Court judge in the peace order hearing, the prosecutors in the State's Attorney's Office, the District Court Commissioner—each opined that the facts alleged by the victim fell within the juror intimidation statute. Only the trial judge at Ms. Rovin's criminal trial reached a different conclusion. The basis for the trial judge's conclusion was that the victim of the alleged intimidation had concluded his service at the trial of Ms. Rovin's daughter, even though (as alleged in the statement of charges) he remained an active member of the jury pool at the time of the incident. That legal conclusion was a questionable interpretation of § 9-305, as the circuit court below indicated, and was never reviewed by an appellate court because, of course, the State cannot appeal an acquittal. Even if one were to conclude that the trial judge in Ms. Rovin's criminal case was correct as to the breadth of § 9-305, it was not the role of the deputy sheriff to foresee the future and overrule the legal judgments of the State's Attorney who authorized the prosecution and arrest and the judicial officer who ordered the arrest by issuing the warrant.

*Id.* at 375–76 (footnote omitted).

[10] Ms. Rovin's amended complaint is now the operative complaint.

[11] The new counts in Ms. Rovin's complaint were counts V and VI, alleging violations of Article 40 and Article 26 of the Maryland Declaration of Rights, respectively. Separately, Ms. Rovin omitted her original count of intentional infliction of emotional distress.

and VI respectively),[12] false light invasion of privacy (Count VII), and defamation (Count VIII). The State filed an answer with respect to the false light invasion of privacy and defamation counts and a second motion to dismiss and/or for summary judgment on the remaining counts. In its motion, the State presented briefing not only on *Heien*, but also on whether law enforcement officers could be civilly liable for an arrest pursuant to a warrant based upon a judicial officer's probable cause determination. The State cited cases from this Court discussing the application of these principles in the context of false imprisonment, false arrest, and malicious prosecution claims.

The circuit court granted summary judgment in favor of the State, reasoning that *Heien*'s mistake of law framework applied. The court ruled that "neither the [deputy nor the sheriff] can be civilly liable for Plaintiff's arrest pursuant to a warrant based on a judicial officer's determination that probable cause existed for said arrest even though that determination was later held by a trial court judge to be based on an error of law." Subsequently, Ms. Rovin moved to certify that order as a final judgment under Maryland Rule 2-602(b),[13] and to stay her remaining claims for false light invasion of privacy and

---

[12] Although Ms. Rovin's state constitutional protections mirror protections that she would have under the Federal Constitution, she has not alleged any federal violations. Recovery for federal violations arise under statute—42 U.S.C. § 1983—"whereas the redress for State violations is through a common law action for damages." *DiPino v. Davis*, 354 Md. 18, 50 (1999). "Unlike in a § 1983 action and unlike in an action for some common law torts, neither the local government official nor a local governmental entity has available any governmental immunity in an action based on rights protected by the State Constitution." *Id*. at 51 (citations omitted).

[13] Maryland Rule 2-602(b)(1) provides, in relevant part, that "[i]f the court expressly determines in a written order that there is no just reason for delay, it may direct in the order

16

defamation. In so doing, she asserted that she would suffer financial hardship if she were forced to proceed on those counts before an appellate court considered the "mistake of law" argument. The circuit court granted her motion and certified its order as an appealable final judgment.[14] Thereafter, Ms. Rovin noted an appeal.

The Appellate Court of Maryland affirmed the decision of the circuit court. *Rovin v. State*, No. 198, Sept. Term, 2022, 2023 WL 4855950 (Md. App. Ct. July 31, 2023). The Appellate Court concluded "that like the Fourth Amendment, Article 26 tolerates an officer's objectively reasonable mistake of law." *Id.* at *17. The court next concluded that there was "probable cause to arrest Ms. Rovin, based upon an objectively reasonable interpretation of the juror intimidation statute[,]" because "threatening a juror shortly after a verdict could serve part of a larger effort to undermine the verdict and secure a new trial, by causing the juror to carry out future duties while intimidated, influenced, or impeded by the threat." *Id.* at *21 (footnote omitted). As for Ms. Rovin's claims under Articles 24 and 40 of the Maryland Declaration of Rights that the juror intimidation statute was unconstitutional, the court held that the statute was not void for vagueness, either facially or as applied to her conduct. *Id.* at *24–26. The court also determined that Ms. Rovin's free speech rights were not violated. Finally, the Appellate Court affirmed

---

the entry of a final judgment . . . as to one or more but fewer than all of the claims or parties[.]"

[14] In its certification order, the circuit court stated, in part, that the "remaining defamation and false light counts in Counts VII and VIII of the Amended Complaint are separate and independent from Counts I-VI" that were resolved by the court's summary judgment order, and "that certifying the [summary judgment order] for appeal is the most judicially expeditious path forward."

the circuit court's grant of summary judgment in favor of the State on Ms. Rovin's claims for false arrest, false imprisonment, and malicious prosecution, because the arrest "warrant provided legal justification for Ms. Rovin's arrest and imprisonment" and because the "officers' construction of Section 9-305(a) was objectively reasonable." *Id.* at *26–27.

Ms. Rovin filed a petition for writ of *certiorari*, which this Court granted to consider whether the circuit court erred in granting summary judgment in favor of the State on Ms. Rovin's claims alleging violations of the Maryland Declaration of Rights and common law torts in connection with her arrest. For the reasons set forth herein, we affirm the judgment of the Appellate Court.

## II

### Standard of Review

We review the decision to grant summary judgment de novo. *Gambrill v. Bd. of Ed. of Dorchester County*, 481 Md. 274, 297 (2022). "We review the record in the light most favorable to the non-moving party and construe any reasonable inferences which may be drawn from the facts against the movant." *Id.* (citation and internal quotations omitted). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and [] the [moving] party is entitled to judgment as a matter of law." Md. Rule 2-501(a). "If no material facts are in dispute, we determine whether the trial judge's ruling was legally correct. Ordinarily, we may affirm the trial court only on the grounds upon which the trial court relied in granting summary judgment." *Gambrill*, 481 Md. at 297

18

(quoting *Newell v. Runnels*, 407 Md. 578, 608 (2009) (internal quotations omitted)). "Nonetheless, we may affirm summary judgment on a different ground if the trial court would have no discretion as to the particular issue." *Wireless One, Inc. v. Mayor & City Council of Baltimore*, 465 Md. 588, 614 n.6 (2019) (quoting *Young Elec. Contractors, Inc. v. Dustin Constr., Inc.*, 459 Md. 356, 383 (2018)) (cleaned up).

In this case, we are asked to decide several questions of law. Specifically, we must determine whether the State may be civilly liable under constitutional and common law claims arising from the plaintiff's arrest pursuant to a warrant that was obtained in good faith and based upon legal advice of the prosecutors, and after a judicial officer determined there was probable cause for the arrest, where the plaintiff was later acquitted of the criminal charge based upon the trial judge's interpretation of the statute in question. We must also determine whether the circuit court erred in granting summary judgment on Ms. Rovin's claim that her arrest and imprisonment violated her free speech rights. Finally, we must determine whether the juror intimidation statute is unconstitutionally vague. We undertake a de novo review in each instance.

## III

### Parties' Contentions

Ms. Rovin's claims all arise out of the same conduct—her arrest pursuant to a warrant for violating the juror intimidation statute where she was later acquitted of the charge based upon the trial judge's interpretation of the statute. Ms. Rovin contends that the State is liable under the common law torts of false arrest, false imprisonment, and

19

malicious prosecution for this conduct. Specifically, Ms. Rovin asserts that because the trial judge determined that her actions did not violate the juror intimidation statute, which resulted in an acquittal, there necessarily could not have been probable cause to arrest, detain, or prosecute her. In particular, she alleges that "based upon the facts contained in the arrest warrant," it was "objectively unreasonable to believe that [she] had committed a crime." Accordingly, she asserts that she was arrested "without legal justification," "without probable cause," and pursuant to a "facially invalid warrant." She further contends that after her arrest, and prior to her prosecution, it should have become "clear and obvious" that her arrest was not supported by probable cause or legal justification, and she should "have been immediately freed from that imprisonment."

In addition to her common law claims, Ms. Rovin asserts that the law enforcement officers violated her rights under the due process and search and seizure provisions of Articles 24[15] and 26[16] of the Maryland Declaration of Rights, respectively. Article 24 protects substantive and procedural due process rights and is the State analogue to the due process clauses of the Fifth and Fourteenth Amendments of the United States Constitution. *State v. Dett*, 391 Md. 81, 92 n.3 (2008). Article 26, like the Fourth Amendment of the

---

[15] Article 24 states: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

[16] Article 26 states: "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

20

United States Constitution,[17] protects a person's right to be free from *unreasonable* searches and seizures.

Ms. Rovin also argues that even if the officers had probable cause to arrest her for violating the juror intimidation statute, her Article 24 rights were nonetheless violated because she was arrested, imprisoned, and prosecuted pursuant to a "statute that is vague and invalid, unconstitutional, and void-for-vagueness[.]" She further asserts that her Article 40[18] free speech rights were violated because, among other things, she was arrested and imprisoned for engaging in protected speech.

The State maintains that there was both probable cause and legal justification to arrest Ms. Rovin, which defeats Ms. Rovin's claims as a matter of law. The State points out that the probable cause determination in this case was made by a neutral magistrate after the deputy obtained legal advice from the State's Attorney's Office. Under these circumstances, the State argues that it was objectively reasonable for the deputy to rely upon the warrant in making the arrest. In addition to the probable cause that attached to the warrant, the State also notes that under the Restatement of Torts, as well as our case

---

[17] The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

[18] Article 40 states: "That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege."

law, a deputy's good faith reliance on legal advice provides a basis for probable cause in the context of malicious prosecution claims.

As a matter of first impression, the State argues that this Court should hold that the State is not liable when a law enforcement officer applies for charges and obtains a warrant based on a reasonable, good faith mistake of law. Although this Court has never addressed whether an individual's Article 26 rights are violated where an officer makes an arrest based upon an objectively reasonable mistake of law, the State points out that in *Heien v. North Carolina*, 574 U.S. 84 (2014)—in the context of reasonable suspicion necessary for a lawful traffic stop—the United States Supreme Court determined that there was no violation of the Fourth Amendment in such an instance. The State asserts that this Court should apply the same principles to Ms. Rovin's civil claims.

We decline the State's invitation to import the United States Supreme Court's *Heien* analysis here for a simple reason. That case involved an officer's *reasonable suspicion* to stop a vehicle based upon the officer's objectively reasonable belief that a motor vehicle law had been violated. In other words, *Heien* applied a constitutional framework to an officer's determination of reasonable suspicion in the field without the benefit of a warrant issued by a neutral judicial officer. In contrast, this case involves a *probable cause* determination by a *judicial officer* in connection with the *issuance of an arrest warrant*. Of course, in either instance, the Fourth Amendment mandates that the search or seizure be objectively reasonable. We determine that consideration of the claims presented here should be analyzed under this Court's and the United States Supreme Court's framework for determining probable cause, and in particular, probable cause to arrest when a warrant

22

is issued. *See DiPino v. Davis*, 354 Md. 18 (1999); *Ashton v. Brown*, 339 Md. 70 (1995);

*Messerschmidt v. Millender*, 565 U.S. 535 (2012); *United States v. Leon*, 468 U.S. 897

(1984).[19]

---

[19] Given our decision not to consider the application of *Heien* in this case, the Dissent argues that we should simply reverse the circuit court's ruling and "not decide the matter on a ground other than the one that the circuit court did and for which we remanded the case in" *Rovin I*. Dissent Slip Op. at 1. We disagree with the Dissent's narrow focus on *Heien* for several reasons.

When the parties initially briefed this matter to this Court in *Rovin I*, the State specifically asked us to consider whether law enforcement officers could be civilly liable for an arrest that was made on an objectively reasonable belief that the conduct was criminal after conferring with prosecutors and obtaining a warrant from a neutral judicial officer. Notwithstanding that the issue was before us, we remanded all the claims related to the deputy because the State mentioned *Heien* in its briefing before us for the first time. *Rovin I*, 472 Md. at 374. As noted, one member of the Court saw no reason to remand and would have determined that the warrant provided probable cause. *Id.* at 374 (McDonald, J., concurring).

On remand, Ms. Rovin amended her complaint, adding two new constitutional claims—violations of Article 26 and Article 40 of the Maryland Declaration of Rights. In response, the State filed a new motion for summary judgment. In addition to arguing that the circuit court should apply *Heien*, the State once again argued and briefed whether the deputy could be liable based upon the probable cause determination made by the neutral judicial officer. Based upon the briefing and arguments, the circuit court ruled that *Heien* applied. The circuit court also ruled that law enforcement cannot be "civilly liable for [Ms. Rovin's] arrest pursuant to a warrant based on a judicial officer's determination that probable cause existed for said arrest even though that determination was later held by a trial court judge to be based on an error of law." In other words, the circuit court expressly ruled that the warrant provided probable cause for Ms. Rovin's arrest.

Whether probable cause existed pursuant to the warrant has been a central focus in the briefs and oral arguments of the parties from the State's initial motion for summary judgment continuing through the briefing to this Court in this second appeal. Moreover, we granted *certiorari* on questions extending beyond the application of *Heien*, including Ms. Rovin's request that we determine "whether the warrant issued for" her "arrest was invalid based on the contents of the warrant, which show no crime was committed." In her opening brief, Ms. Rovin argued that the circuit court's "warrant-related analysis [was]

It is therefore unnecessary for us to consider whether we adopt the Supreme Court's

*Heien* analysis when considering an Article 26 claim.[20]  We shall save that question for

another day.[21]

---

[in]correct[,]" and that the "circuit court was also wrong in concluding that the warrant acted as an absolute shield against liability[.]"  Ms. Rovin has squarely placed before us the issues of whether there was probable cause for her arrest and the validity of the warrant. There is no reason for this Court to limit its consideration of this case simply to whether *Heien* applies.

[20] Although *Heien* concerned a mistake of law in the context of reasonable suspicion necessary for a lawful traffic stop, we observe that the Supreme Court relied heavily upon its probable cause jurisprudence in holding that the Fourth Amendment tolerates objectively reasonable mistakes of law.  *Heien v. North Carolina*, 574 U.S. 54, 62–64 (2014) (discussing *United States v. Riddle*, 9 U.S. (Cranch) 311 (1809) and *Michigan v. DeFillippo*, 443 U.S. 31 (1979)).

We further observe that courts routinely conclude that the Supreme Court's analysis in *Heien* applies to probable cause determinations.  *See, e.g.*, *Mahone v. Georgia*, No. 20-14752, 2022 WL 2388426, at *3 (11th Cir. July 1, 2022), *cert. denied*, 143 S. Ct. 435 (2022) (determining that there was no Fourth Amendment violation in the context of a civil suit filed against the state where an officer made a reasonable mistake of law by erroneously believing that the plaintiff committed a home invasion under an interpretation of a statute); *United States v. Stevenson*, 43 F.4th 641, 645 (6th Cir. 2022) (observing that "officers may make certain reasonable mistakes [of law] and still have probable cause"); *United States v. Diaz*, 854 F.3d 197, 203–05 (2d Cir. 2017) (holding that an objectively reasonable mistake of law supported probable cause); *Cahaly v. Larosa*, 796 F.3d 399, 408 (4th Cir. 2015) (stating that "officers may have probable cause to arrest based on reasonable mistakes of law" (internal quotations omitted)); *May v. Pritchett*, No. 22-10147, 2022 WL 16753599, at *5 (11th Cir. Nov. 8, 2022) (stating that "probable cause or reasonable suspicion can rest on objectively reasonable mistakes of fact or law" (footnote and citation omitted)).  We simply conclude here that we can consider Ms. Rovin's claims within the existing framework of the probable cause jurisprudence of this Court and the United States Supreme Court.  As such, we need not decide whether *Heien* applies to claims arising under Article 26 of the Maryland Declaration of Rights.

[21] Given that we have determined that Ms. Rovin's claims for false arrest, false imprisonment, and malicious prosecution, as well as her state constitutional claims arising from the same conduct, may be resolved without considering whether to adopt *Heien*, we abrogate the Appellate Court's determination that *Heien* governs this analysis.

24

# IV

## Discussion

At the outset, we mention some key analytical principles that govern our consideration of the issues presented in this case. *First*, although in certain contexts the contours of state constitutional rights are not precisely the same as federal constitutional rights, in the context of the allegations presented here, we have consistently construed the state constitutional rights *in pari materia* with the comparable rights under the Federal Constitution.[22]

*Second*, the facts upon which Ms. Rovin relies to support her common law claims and constitutional claims arising under Article 26 and Article 24 (as they pertain to false arrest, false imprisonment, and malicious prosecution) are the same. In cases in which the plaintiff alleges common law and constitutional claims arising from the same conduct— here, an unlawful arrest and imprisonment—we consider the claims together. *See State v.*

---

[22] *See DiPino v. Davis*, 354 Md. 18 (2006) (analyzing civil common law claims for malicious prosecution and state constitutional claims alleging violations of Articles 24, 26, and 40 *in pari materia* with their federal constitutional analogues); *see also King v. State*, 434 Md. 472, 483 (2013) (stating that "[a]lthough we have asserted that Article 26 may have a meaning independent of the Fourth Amendment," to date, we have not held "that it provides greater protection against state searches than its federal kin"); *Padilla v. State*, 180 Md. App. 210, 226 (2008) (observing that "the cases are legion in which Maryland courts have construed Article 26 *in pari materia* with the Fourth Amendment") (collecting cases); Irma S. Raker, *Fourth Amendment and Independent State Grounds*, 77 Miss. L.J. 401, 403 (2007) ("With respect to Article 26, Maryland has not resolved Fourth Amendment issues on independent state grounds and continues to interpret Article 26 in pari materia with the United States Supreme Court's interpretation of the Fourth Amendment."); *Kirsch v. Prince George's County*, 331 Md. 89 (1993) (construing the due process and equal protection rights embodied in Article 24 *in pari materia* with the Fifth and Fourteenth Amendments); *Jakanna Woodworks, Inc. v. Montgomery County*, 344 Md. 584 (1997) (explaining that the freedoms protected by Article 40 are co-extensive with those protected by the First Amendment).

*Dett*, 391 Md. 81, 92 (2006) (analyzing the plaintiff's Article 24 claim and the common law false imprisonment claim together because there was no separate, independent argument with respect to the constitutional provision); *Okwa v. Harper*, 360 Md. 161, 202 (2000) (concluding that, for purposes of summary judgment, defendants did not have legal authority to arrest the plaintiff, and on that basis alone, summary judgment was improperly granted on the plaintiff's Article 24 claims); *see also Roshchin v. State*, 219 Md. App. 169, 181 (2014), *rev'd on other grounds*, 446 Md. 128 (2016) (explaining that "because it is clear" that the plaintiff's Article 24 claim was "based on an alleged arrest without proper justification," the court applied "the same standard in assessing this claim as is applicable to an alleged violation of the Fourth Amendment to the United States Constitution" (citing *Dett*, 391 Md. at 92)).

*Third*, as our case law makes clear, when considering whether a plaintiff has set forth a common law claim for false arrest, false imprisonment, or malicious prosecution, the test as to whether probable cause and legal justification exist in a particular case is judged by principles applicable to the law of arrest. *Ashton*, 339 Md. at 120; *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 655 (1970).

### A. *Common Law Elements*

Although Ms. Rovin has alleged separate claims for false arrest and false imprisonment, the elements "are identical." *Heron v. Strader*, 361 Md. 258, 264 (2000). They are: (1) a deprivation of the liberty of another; (2) without consent; and (3) without legal justification. *Id.*; *see also Ashton*, 339 Md. at 119. Here, like the vast majority of false

26

arrest cases, our focus is on the last element—whether the deprivation was without legal justification.

The necessary elements for a malicious prosecution claim are: (1) a criminal proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the accused; (3) absence of probable cause for the proceeding; and (4) "malice," meaning that the primary purpose in instituting the proceeding was something other than bringing an offender to justice. *Heron*, 361 Md. at 264.

Our focus here is on two elements—probable cause for purposes of the malicious prosecution claim, and legal justification for purposes of the false arrest and false imprisonment claims. In many contexts, the element of "legal justification" for establishing false arrest and false imprisonment is different from the "probable cause" element for malicious prosecution. *See Ashton*, 339 Md. at 119–121.[23] However, within the context of

---

[23] We discussed the concept of "legal justification" in the context of false imprisonment in *Ashton v. Brown*, 339 Md. 70 (1995). That case involved warrantless arrests of minors for violating a local curfew ordinance that this Court later held to be facially unconstitutional. *Id.* at 90. After declaring the ordinance unconstitutional, we discussed, among other things, the arresting officers' liability for Maryland common law and constitutional torts based on false imprisonment. *Id.* While examining liability in tort for warrantless arrests, we discussed the distinction between arrests made pursuant to warrants and warrantless arrests. *Id.* at 120. Specifically, we observed that "the test whether legal justification exist[s] in a particular case has been judged by the principles applicable to the law of arrest." *Id.* (quoting *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 655 (1970)). We discussed how we applied these principles in our case law and pointed out that just as a law enforcement officer's authority to arrest is different for each type of arrest, so too is the liability for any civil action that may follow from the arrest. *Id.* First, we observed that a police officer has legal justification—and is therefore not civilly liable—where the officer makes an arrest pursuant to a warrant that "appears on its face to be legal" "even if, unbeknownst to the arresting police officer, the warrant is in fact improper." *Id.* (citing *Brewer v. Mele*, 267 Md. 437, 440 (1972), *Lewin v. Uzuber*, 65 Md.

27

the claims presented by Ms. Rovin here—which are governed by the principles applicable to the law of arrest involving an arrest warrant and based upon the objectively reasonable standard governing the officer's reliance on said warrant—the elements of legal justification and probable cause overlap. Therefore, to prevail on the common law claims that have been asserted in this case and on the state constitutional claims alleging the same conduct, Ms. Rovin must establish a lack of probable cause. In other words, the presence of probable cause defeats these claims as a matter of law.

### B.    *Probable Cause Principles Generally*

The Fourth Amendment of the United States Constitution, made applicable to the states by the Fourteenth Amendment, protects against "unreasonable" searches and seizures. U.S. Const. amend. IV. The Fourth Amendment is not a "guarantee against *all* searches and seizures, but only against *unreasonable* searches and seizures." *United States v. Sharpe*, 470 U.S. 675, 682 (1985) (emphasis in original). It is an oft-cited proposition that the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381–82 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). As we noted, Article 26 of the Maryland Declaration of Rights provides the same protections as the Fourth Amendment.

---

341, 348 (1886), *Campbell v. Webb*, 11 Md. 471, 482 (1857)). Second, we noted that a police officer also "has legal justification to make a warrantless arrest where he has probable cause to believe that a felony has been committed, and that the arrestee perpetrated the offense." *Id.* "[W]ith respect to both of these types of arrest," we stated that "legal justification to arrest may depend, in part, upon the arresting officer's good faith and reasonable belief in his authority to arrest." *Id.*

28

To satisfy the requirements of the Fourth Amendment and Article 26, probable cause is required for both warrantless arrests and arrests pursuant to a warrant.[24] "Probable cause" is a term of art in Fourth Amendment jurisprudence and is defined as "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Stevenson v. State*, 455 Md. 709, 722 (2017) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)); *see also Doering v. State*, 313 Md. 384, 403 (1988) (explaining that probable cause is a "non-technical conception of a reasonable ground for belief of guilt, requiring less evidence for such belief than would justify conviction but more evidence than that which would arouse a mere suspicion"). Thus, "'the quanta of proof' appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision." *Id.* at 722 (quoting *Pringle*, 540 U.S. at 371) (cleaned up). Probable cause is "a fluid concept[,]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983), "incapable of precise definition or quantification into percentages because it deals with probabilities and depends on the totality of the circumstances." *Pringle*, 540 U.S. at 371. The standard represents "a necessary accommodation between the individual's right to liberty and the State's duty to control crime." *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975).

---

[24] Although this case involves an arrest pursuant to a warrant, it is well established that with probable cause to believe a person has committed a felony or is committing a felony or misdemeanor in the presence of police, police may constitutionally arrest that person without a warrant. *See Pacheco v. State*, 465 Md. 311, 322 (2019).

Probable cause to arrest under federal and state constitutional law is determined based upon an objective standard. *Davis v. DiPino*, 121 Md. App. 28, 51 (1988) (citing *Delaware v. Prouse*, 440 U.S. 648, 654 (1979), *Little v. State*, 300 Md. 485, 494 (1984)). Under this objective standard, probable cause to arrest exists where "the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Elliot v. State*, 417 Md. 413, 431 (2010) (quoting *Longshore v. State*, 399 Md. 486, 501 (2007)) (internal quotation marks and alterations omitted).

When an arrest involves a warrant, the probable cause analysis (as well as the legal justification analysis for purposes of false arrest and false imprisonment), requires the application of different principles. We therefore turn to the manner in which probable cause is determined in the context of an arrest pursuant to a warrant.

### C.    *Arrest Warrants and the "Strong Presumption" of Probable Cause*

A warrant must be issued "upon probable cause," which must be supported by "Oath or affirmation," *see* U.S. Const. amend IV; Md. Decl. R. Art. 26, and issued by a "neutral and detached magistrate[,]" *see Johnston v. United States*, 333 U.S. 10, 14 (1948). *See* Wayne R. LaFave, *Search and Seizure* § 5.1(h) (6th ed. 2020) (stating that "[u]nder the Fourth Amendment, a warrant may only issue upon probable cause, which in the case of an arrest warrant means probable cause to believe that an offense has been committed and also probable cause to believe that the person to be arrested committed it"). Notably, "[*i*]*t*

30

*is for the issuing magistrate rather than the complainant to determine whether this probable cause exists*[.]" *Id.* (emphasis added).

When considering whether a warrant may issue based upon probable cause, "[t]he task of the issuing judge [or judicial officer] is to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability" that an offense has been or is being committed by the person to be arrested. *Greenstreet v. State*, 392 Md. 652, 667 (2006) (citing *Gates*, 462 U.S. at 238–39). In the suppression context, a reviewing court applies a highly deferential standard of review. *Id.* at 668. Under that standard, the "duty of a reviewing court is to ensure that the issuing judge had a substantial basis for concluding that probable cause existed." *Id.* (cleaned up). In doing so, a reviewing court ordinarily confines its "consideration of probable cause solely to the information provided in the warrant and its accompanying application documents." *Id.* at 669. The reviewing court does not consider "evidence that seeks to supplement or controvert the truth of the grounds advanced in the affidavit." *Id.* This principle is known as the "four corners rule." *Id.* One exception to this rule is where "testimony or other proof is proffered by a defendant that the police officer who sought the warrant provided deliberately false material evidence to support the warrant or held a reckless disregard for the truth." *Id.* (citing *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978)).

The Supreme Court of the United States has explained the deference due to an issuing judge's probable cause determination:

Because a search warrant provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer engaged in the often competitive enterprise of ferreting out crime, we have expressed a strong preference for warrants and declared that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall. Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination.

*United States v. Leon*, 468 U.S. 897, 913–14 (1984) (cleaned up). Accordingly, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. Once the warrant issues, there is literally nothing more the police[ officer] can do in seeking to comply with the law. Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921 (cleaned up).

As the Supreme Court has held, "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or," as we have sometimes put it, "in 'objective good faith.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Leon*, 468 U.S. at 922–23). Nonetheless, under Supreme Court precedent, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Id.* at 547. In other words, the warrant is not an absolute shield

32

against civil liability. That said, the threshold for determining whether one of the narrow exceptions below applies is a "high one." *Id.*

In the context of the good faith exception to the exclusionary rule,[25] the Supreme Court has outlined four circumstances under which police will be unable to reasonably rely on a warrant that is later determined to have been improperly issued:

> (1) when the judicial officer issuing the warrant was misled by an affidavit that "the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) when the magistrate "wholly abandoned his judicial role;" (3) when "a warrant [is] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) when the warrant is facially deficient (*e.g.*, failing to particularize the place to be searched).

*Minor v. State*, 334 Md. 707, 712 (1994) (quoting *Leon*, 468 U.S. at 923) (internal quotations omitted) (alteration in original).[26]

---

[25] Maryland does not have an independent exclusionary rule for physical evidence. Instead, we recognize and routinely apply the good-faith exception that was enunciated by the United States Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984). *See e.g.*, *Richardson v. State*, 481 Md. 423, 468–69 (2022); *Whittington v. State*, 474 Md. 1, 37 (2021); *Stevenson v. State*, 455 Md. 709 (2017); *Patterson v. State*, 401 Md. 76 (2007); *Greenstreet v. State*, 392 Md. 652 (2006); *Agurs v. State*, 415 Md. 62, 77–78 (2010); *Minor v. State*, 334 Md. 707 (1994).

[26] In *Leon*, the Supreme Court "held that the federal exclusionary rule does not apply to evidence obtained under a search warrant that has later been found to be deficient, so long as the law enforcement officers acted in objectively reasonable reliance on the warrant." *Minor*, 334 Md. at 712 (citing *Leon*, 468 U.S. at 913). The "exclusionary rule is designed to deter police misconduct, rather than to punish the errors of neutral magistrates." *Id.* at 713. The holding in *Leon* "is also based upon the 'great deference' that is afforded search warrants issued by neutral magistrates." *Id.* (quoting *Leon*, 468 U.S. at 914). "Consequently, when police officers have acted in good faith pursuant to a search warrant that is later invalidated, excluding evidence would 'only rarely' serve the purposes of the exclusionary rule." *Id.* (quoting *Leon*, 468 U.S. at 926).

While the Supreme Court has regularly discussed and considered the *Leon* exceptions in the context of criminal suppression hearings, it has also applied them in other contexts, including whether a police officer is able to rely upon the probable cause determination that attached to a warrant under 42 U.S.C. § 1983 claims in which the supporting affidavit failed to establish probable cause. *See Messerschmidt v. Millender*, 565 U.S. 535 (2012); *Malley v. Briggs*, 475 U.S. 335 (1986). For purposes of determining whether probable cause and legal justification exist under our common law and constitutional claims, we do the same here.[27]

We first pause to clarify one point. The right of recovery for federal constitutional violations by state officials arises from statute—42 U.S.C. § 1983—and involves the consideration of government immunity. By contrast, "the redress for State [constitutional] violations is through a common law action for damages."[28] *DiPino*, 354 Md. at 50. As

---

[27] The Dissent criticizes our discussion of *Messerschmidt* because it was not cited by the parties. Dissent Slip Op. at 8. To be sure, the parties' focus was on *Heien*, which is understandable given our discussion of *Heien* in *Rovin I*. That said, we determine that it is prudent to rely upon settled precedent of the United States Supreme Court, which holds that a strong presumption of probable cause attaches to a warrant in contexts similar to Ms. Rovin's common law and constitutional claims. The Supreme Court's reasoning in *Heien* and *Messerschmidt* is rooted in objective reasonableness—the touchstone of the Fourth Amendment—a principle upon which this Court regularly relies when considering probable cause. There is no reason for us to withhold consideration of this precedent in the context of this case.

[28] We have previously recognized such a common law cause of action for damages "where an individual is deprived of his liberty or property interests in violation of Articles 24 and 26[.]" *Widgeon v. Eastern Shore Hosp. Center*, 300 Md. 520, 537–38 (1984). In doing so, we emphasized that we did "not suggest that a violation of every state constitutional right gives rise to a common law action for damages." *Id.*; *see also DiPino*, 354 Md. at 50 n.7 ("We do not mean in any way to suggest that an action for damages lies

34

such, Ms. Rovin's constitutional claims for damages for her false imprisonment, malicious prosecution, and false imprisonment can be vindicated by a common law tort action. Under the State Constitution, governmental officials do not have qualified immunity when a violation is established. Although "[p]roof that [an] official acted in [an] objectively reasonable" manner that would exempt the official from liability under Section 1983 is not relevant to whether an official has immunity for state constitutional claims, it *is relevant* to "whether the official committed a violation" in the first instance. *Id.* at 51. In other words, if the plaintiff's arrest and imprisonment were supported by probable cause and were therefore objectively reasonable, there is no violation of the common law torts or of state constitutional rights in the first instance. Stated another way, we apply the same principles of "objective reasonableness" underlying the application of a Section 1983 qualified immunity determination when considering whether a plaintiff's arrest was objectively reasonable, which would defeat the common law claims and constitutional claims arising from the same conduct as a matter of law. Accordingly, we turn to the Supreme Court's articulation of these principles and its jurisprudence relating to civil cases alleging violations of the Fourth Amendment involving warrants.

In *Malley*, the Supreme Court held that "the same standard of objective reasonableness that [it] applied in the context of a suppression hearing in *Leon* . . . defines the qualified immunity accorded an officer whose request for a warrant allegedly caused an unconstitutional arrest." 475 U.S. at 344 (footnote omitted). The Court explained that

---

for the violation of all provisions of the Constitution or Declaration of Rights; it may or may not[.]" (emphasis omitted)).

the relevant question is whether a "reasonably well-trained officer" "would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." *Id.* at 345 (footnote omitted).

In *Messerschmidt*, the Supreme Court expounded upon the principles expressed in *Malley* in the context of a civil suit under Section 1983 filed by occupants of a residence against deputy sheriffs and a county sheriff's department, alleging that they were subjected to an unreasonable search because the warrant authorizing the search of their home was not supported by probable cause. 565 U.S. at 546. In that case, a deputy undertook an investigation into a woman's assault by her boyfriend, during which the woman advised that the boyfriend had ties to a gang. *Id.* at 540–42. The deputy sought two warrants: one for the boyfriend's arrest and one to search his home. *Id.* at 541. The search warrant sought to seize items related to gang activities and weapons. *Id.* Prior to submitting the warrant applications to a neutral magistrate for approval, the deputy had them reviewed by his supervisor as well as a deputy district attorney. *Id.* at 543.

The occupants filed suit against, among others, the sheriff's department and the deputy, alleging that the search warrant was unconstitutionally overbroad and seeking damages. *Id.* at 544. After the parties filed cross-motions for summary judgment on the validity of the search warrant, the district court found that the warrant was invalid because it was overbroad in two respects: (1) it authorized a search for weapons in excess of the specific weapon that was allegedly used in a crime; and (2) it sought evidence related to gang-related materials, when there was no evidence that the crime was gang-related. *Id.* The district court determined that the third *Leon* exception applied and rejected the officers'

36

claim that they were entitled to qualified immunity. *Id.* After the United States Court of Appeals for the Ninth Circuit affirmed the district court's denial of qualified immunity, the Supreme Court granted *certiorari* and reversed the judgment. *Id.* at 556.

The Court considered the plaintiffs' claim that the officers were not entitled to qualified immunity because the warrant satisfied the third *Leon* exception—that the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable—which "allow[s] suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue.'" *Id.* at 547 (quoting *Malley*, 475 U.S. at 341). The threshold for establishing "this narrow exception" "is a high one" because, "[i]n the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination" because "[i]t is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment." *Id.* (quoting *Leon*, 468 U.S. at 921; *Malley*, 475 U.S. at 346 n.9 ("It is a sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable." (internal quotations and citation omitted))).

The Court disagreed that the plaintiffs had satisfied the high threshold to overcome the presumption of probable cause that was established by the neutral magistrate's warrant. *Id.* at 548–49. The Court determined that it was not "entirely unreasonable" for an officer

37

to believe, "in the particular circumstances of [the] case," that there was probable cause to search for firearms beyond the particular weapon allegedly used in the crime and that evidence regarding gang affiliation would be helpful for prosecuting the plaintiff in the attack on his girlfriend. *Id.* at 548–50.

In reversing the Ninth Circuit, the Supreme Court observed that the appellate court "gave no weight" to the fact that the officers had the warrant reviewed and approved by their superiors, a deputy district attorney, and a neutral magistrate. *Id.* at 553–54. The Court observed that "the officers thus 'took every step that could reasonably be expected of them.'" *Id.* at 554 (quoting *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984)). The Court reasoned that, "[i]n light of the foregoing, it cannot be said that no officer of reasonable competence would have requested the warrant," and "[i]ndeed, a contrary conclusion would mean not only that [the officers] were plainly incompetent, but that their supervisor, the deputy district attorney, and the Magistrate were as well." *Id.* (internal quotations and citations omitted).

The Court concluded by stating:

> The question in this case is not whether the Magistrate erred in believing that there was sufficient probable cause to support the scope of the warrant he issued. It is instead whether the Magistrate so obviously erred that any reasonable officer would have recognized the error. The occasions on which this standard will be met may be rare, but so too are the circumstances in which it will be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions. Even if the warrant in this case were invalid, it was not so obviously lacking in probable cause that officers can be considered "plainly incompetent" for concluding otherwise.

*Id.* at 556 (quoting *Malley,* 475 U.S. at 341).

38

**D.** **A Summary of the Probable Cause Framework that Applies to Common Law Claims Alleging False Arrest, False Imprisonment, and Malicious Prosecution Arising from a Warrant**

We summarize the principles that apply to a common law tort claim seeking redress for false arrest, false imprisonment, or malicious prosecution arising from an officer's arrest pursuant to a warrant. When an arrest is pursuant to a warrant, probable cause is predetermined by a judicial officer. The issuance of a warrant by a neutral issuing judge or judicial officer creates a strong presumption that it was objectively reasonable for officers to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on a lack of probable cause faces a heavy burden. *See Messerschmidt*, 565 U.S. at 546; *see also Horton v. Portsmouth Police Dep't*, 22 A.3d 1115, 1124 (R.I. 2011) (Rhode Island Supreme Court applying these principles in the context of common law claims for malicious prosecution and probable cause to arrest).

Of course, the warrant is not an absolute shield, and civil liability will arise in circumstances in which "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Messerschmidt*, 565 U.S. at 547 (quoting *Malley*, 475 U.S. at 341). In order to overcome the presumption of objective reasonableness that attaches to a warrant, the plaintiff must demonstrate that one or more of the *Leon* exceptions apply, namely that: (1) the judicial officer issuing the warrant was misled by an affidavit that the "affiant knew was false or would have known was false except for his reckless disregard of the truth"; (2) the judicial officer "wholly abandoned his" or her "judicial role"; (3) the "warrant [was] based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; *or* (4) the warrant is so

39

facially deficient that the executing officers cannot reasonably presume it to be valid. *Leon*, 468 U.S. at 923; *see also Malley*, 475 U.S. at 344–45; *Messerschmidt*, 565 U.S. at 547–48. The application of these principles is based upon the "sound presumption that" the judicial officer "is more qualified than the police officer to make a probable cause determination, and it goes without saying that where a [judicial officer] acts mistakenly in issuing a warrant but within the range of professional competence of [a judicial officer], the officer who requested the warrant cannot be held liable." *Malley*, 475 U.S. at 346 n.9 (internal quotation marks and citation omitted).

### E. Another Probable Cause Presumption—Arising from the Prosecutor's Legal Advice

In addition to the strong presumption of probable cause that attaches to a warrant, we also point out a separate basis from which an officer can reasonably believe that a warrant is supported by probable cause. That is, when an officer obtains and follows legal advice from a prosecutor when applying for a statement of charges after presenting a full and fair disclosure of everything that was presented to the officer, there is "further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause."[29]  *Messerschmidt*, 565 U.S. at 553.

---

[29] The Dissent mischaracterizes the separate basis for probable cause that arises from an officer obtaining and relying upon a prosecutor's legal advice as being "akin to a grant of absolute immunity[.]" Dissent Slip Op. at 11 n.6. We disagree. An officer who obtains and relies upon legal advice simply has a separate basis upon which the officer can reasonably believe that a warrant is supported by probable cause.

Indeed, our adoption of the probable cause principles outlined in *Messerschmidt* in the context of law enforcement's reliance on the prosecutor's advice offers less protection

With these principles in mind, we turn to Ms. Rovin's allegations.

## F.    *Ms. Rovin's Claims as Alleged in Her Amended Complaint*

As we already noted, Ms. Rovin asserts that the State is liable under the common law torts of false arrest, false imprisonment, and malicious prosecution, and attendant constitutional claims, for the deputy's conduct in obtaining a warrant resulting in her arrest for violating the juror intimidation statute because under her interpretation of the juror intimidation statute—which was accepted by the trial judge—her conduct did not violate the statute as a matter of law.  Although she acknowledges in her complaint that the deputy consulted with the State's Attorney's Office prior to filing the charge, and that the warrant was issued by a District Court Commissioner, she nonetheless asserts that there was no legal justification or probable cause to arrest her because her actions did not amount to a crime "as a matter of law."  She further asserts that "based on the facts contained in the

---

than the Restatement (Second) of Torts in the malicious prosecution context, which provides:

> The advice of an attorney at law admitted to practice and practicing in the state in which the proceedings are brought, whom the client has no reason to believe to have a personal interest in obtaining a conviction, *is conclusive of the existence of probable cause* for initiating criminal proceedings in reliance upon the advice if it is:
>
> (a) sought in good faith, and
>
> (b) given after a full disclosure of the facts within the accuser's knowledge and information.

Restatement (Second) of Torts § 666(1) (Effect of Advice of Counsel) (1977) (emphasis added); *see also Rovin I*, 472 Md. at 368 n.15; *Gladding Chevrolet, Inc. v. Fowler*, 264 Md. 499, 509 (1972); *Kennedy v. Crouch*, 191 Md. 580, 587 (1948).

41

warrant affidavit and alleged against her[,]" it was "objectively unreasonable to believe that" she had committed a crime. Additionally, Ms. Rovin asserts that the warrant was "facially invalid." We address these contentions below.

*First*, the issuance of the warrant by the neutral District Court Commissioner "creates a presumption that it was objectively reasonable for the officer[] to believe that there was probable cause, and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden." *Horton*, 22 A.3d at 1124; *see Messerschmidt*, 565 U.S. at 553.

*Second*, the deputy sought and relied upon the advice of the State's Attorney's Office in making the application for statement of charges. Such action "provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." *Messerschmidt*, 565 U.S. at 553. "In light of the foregoing, it cannot be said that no officer of reasonable competence would have requested the warrant[,]" and "[i]ndeed, a contrary conclusion would mean not only that" Deputy Cook was "plainly incompetent, but that" the State's Attorney's Office and the District Court Commissioner "were as well." *Id.* at 554. In this case, Deputy Cook took "every step that could reasonably be expected of" him. *Id.* Stated another way, it "was not the role of the deputy sheriff to foresee the future and overrule the legal judgments of the State's Attorney who authorized the prosecution and arrest and the judicial officer who

ordered the arrest by issuing the warrant." *Rovin I*, 472 Md. at 375–76 (McDonald, J., concurring).[30]

Ms. Rovin points out that a warrant "is not an absolute shield" to civil liability and that she can overcome the strong presumption of probable cause attendant to a validly executed search warrant in this case. She recites several of the *Leon* factors in her complaint. As an initial matter, we note that she has not alleged the first one. Specifically, as we observed in *Rovin I*, "Ms. Rovin has not alleged that [Deputy Cook] made material omissions or misstatements of fact in the arrest warrant application[.]" 472 Md. at 366. Although she disagrees with the foreperson's account of the events, she does not allege that Deputy Cook falsely recounted those events in the application for charges as they were reported to him by the foreperson, and for good reason. Comparing the Deputy's recitation of the facts in the application for statement of charges with the foreperson's testimony under oath that he provided at the peace order hearing on the same day, they are consistent, if not identical. In other words, the undisputed evidence is that Deputy Cook recounted the facts in the application for statement of charges as the foreperson had recounted them to him.

However, Ms. Rovin asserts that the warrant in this case fits within several other *Leon* exceptions—namely, that the warrant was based on an affidavit "so lacking in indicia

---

[30] In the parties' first trip to our Court, we held that the State is not liable in tort for the *prosecutor's conduct in advising the deputy* to file an application for charges based upon the prosecutor's advice. *Rovin I*, 472 Md. at 355–56. It would be incongruous to hold the State civilly liable for the *deputy's conduct in relying upon the prosecutor's advice* to file an application for charges.

of probable cause as to render official belief in its existence entirely unreasonable" and that the warrant was "facially deficient." She also argues that the District Court Commissioner "wholly abandoned his judicial role by rubber stamping a warrant application obviously lacking in probable cause."

Where there is no genuine dispute as to the material facts, the question whether those facts do or do not amount to probable cause is one of law for the court. *Palmer Ford, Inc. v. Wood*, 298 Md. 484, 509–11 (1984) (explaining that where the material facts on which the defendants relied in initiating prosecution were not in dispute, whether those facts established probable cause was a question of law for the court). To determine whether Ms. Rovin has satisfied the "high burden" of overcoming the strong presumption of probable cause that attached to the warrant, we turn to the application for statement of charges that was presented to the District Court Commissioner, which asserted the following under oath:

- The victim of the crime had been the foreperson serving on a jury in which Ms. Rovin's daughter was convicted of a crime. The presiding judge sentenced Ms. Rovin's daughter to jail time.

- Apparently during the trial, Ms. Rovin became disorderly and had to be escorted out of the court room.

- After the trial concluded, Ms. Rovin called the foreperson's workplace and became verbally aggressive with the receptionist.

- At approximately 5:30 p.m. on the same day, Ms. Rovin visited the foreperson's workplace.

- Ms. Rovin became verbally assaultive with the foreperson, and the foreperson escorted Ms. Rovin to his office so patrons would not see the commotion.

44

- Ms. Rovin complained to the foreperson that he "sent her daughter to jail." Due to her "erratic and aggressive behavior," the foreperson told Ms. Rovin that she had to leave and began escorting her out of the building. According to the foreperson, Ms. Rovin "would get close to him, invading his personal space and to the point where he felt very uncomfortable and threatened."

- Prior to leaving, Ms. Rovin "threatened" the foreperson by telling him that "Bill Rovin" would "take care of him." The foreperson had no idea who Bill Rovin was. When the foreperson denied having any knowledge of this individual, Ms. Rovin claimed that Bill Rovin "worked in Nicaragua" and has people that will "take care of him." The foreperson felt this statement "was an indirect death threat."

- The Deputy attempted to contact Ms. Rovin at the number from which she initially called in order to warn her not to continue her tactics and to verbally ban her from the foreperson's place of work. Ms. Rovin did not answer. The deputy left a message. As of the time of the application of charges, Ms. Rovin had not returned the call.

- The Deputy contacted members of the State's Attorney's Office by email as well as through telephone communications. The Deputy spoke with an investigator with the State's Attorney's Office who had been in communication with the State's Attorney as well as the Assistant State's Attorney (who had handled Ms. Rovin's daughter's trial). That Office "believed that this was a case of" "jury intimidation and should be charged accordingly."

- At the time when Ms. Rovin "threatened and intimidated" the foreperson, he was still a member of the Wicomico County jury pool. He was assigned as a juror for the circuit court for the month of June 2015. As a result of this incident, he was discharged from further duty for the month.

The application for statement of charges is based upon the State's Attorney's Office's interpretation of the juror intimidation statute. Under this interpretation, the foreperson was a juror for the month of June. He had to be excused from jury service after Ms. Rovin went to his place of business and "threatened and intimidated him." We observe that the State's Attorney's Office did not waver from this interpretation—from the advice

45

initially given to Deputy Cook when he applied for the statement of charges through and up until the Assistant State's Attorney's arguments to the judge at Ms. Rovin's trial.

Ms. Rovin asserts that the above application for statement of charges did not set forth a crime as a "matter of law" because the foreperson "was not a member of the jury at the time of her visit[]" to the foreperson's workplace. Under Ms. Rovin's interpretation of the statute, because the foreperson was no longer a member of the jury who convicted her daughter, she could not have interfered with his "official duties" by influencing a jury verdict or an ongoing trial.

At bottom, *all* of Ms. Rovin's assertions flow from one premise, namely that the State's Attorney's Office's legal interpretation of the juror intimidation statute—which is described above in the application for statement of charges submitted under oath by Deputy Cook and upon which Ms. Rovin was subsequently arrested and tried—was so obviously incorrect that "no reasonably competent officer would have concluded that a warrant should issue." *Messerschmidt*, 565 U.S. at 547.

We disagree. We determine that the State's Attorney's Office's interpretation of the juror intimidation statute—which formed the basis of the statement of charges, and upon which Ms. Rovin was arrested—was an objectively reasonable, if not the correct, interpretation. We explain our reasoning as follows.

46

*G.* ***The Interpretation of the Juror Intimidation Statute Set Forth in the Application for Statement of Charges, Which Was Consistent with the State's Attorney's Argument at Trial, Was Objectively Reasonable***

Under CR § 9-305(a), "[a] person may not, by threat, force, or corrupt means, try to influence, intimidate, or impede a juror, a witness, or an officer of a court of the State or of the United States in the performance of the person's official duties."

This Court has never interpreted the juror intimidation statute with respect to the meaning of the word "juror" or the scope of the juror's "official duties." Moreover, although this Court has interpreted the meaning of the statute, as well as prior versions of it, within the context of witness intimidation and obstruction of justice, *see, e.g.*, *State v. Wilson*, 471 Md. 136 (2020), *State v. Pagano*, 341 Md. 129 (1996), *Romans v. State*, 178 Md. 588 (1940), we have not had an occasion to interpret its scope and meaning within the context of *juror* intimidation.

In undertaking this analysis, we turn to our traditional canons of statutory interpretation to examine the statute in question. Our ultimate objective "is to extract and effectuate the actual intent of the Legislature in enacting the statute." *Goshen Run Homeowners Ass'n, Inc. v. Cisneros*, 467 Md. 74, 107 (2020) (quotations omitted). "This process begins with an examination of the plain language of the statute." *Id.* at 107–08. "If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent" ordinarily ends "and we apply the statute as written without resort to other rules of construction." *Hoang v. Lowery*, 469 Md. 95, 119 (2020) (quotations omitted). We do not, however, analyze statutory language in a vacuum. *Id.* Rather, we view the statutory language "in the context of the statutory scheme to which

47

it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute."

*Id.* (quotations omitted). "Where the language of the statute is ambiguous and may be subject

to more than one interpretation," "we look to the statute's legislative history, case law,

purpose, structure, and overarching statutory scheme in aid of searching for the intention of

the Legislature." *Koste v. Oxford*, 431 Md. 14, 26 (2013) (citations omitted).

### 1. The Juror Intimidation Statute

The juror intimidation statute was first enacted in 1853.[31]  From its initial enactment

until 2002, the language of the statute changed very little, and prohibited not only juror and

witness intimidation, but also various forms of obstruction of justice.  *Compare* Acts of

1853, ch. 450 § 2, *with* Md. Code, Art. 27, § 26 (1957, 1996 Repl. Vol., 2001 Supp.).[32]

---

[31] The following statute was enacted by Chapter 450, § 2 of the Acts of 1853:

> That if any person or persons shall corruptly, or by threats or force, endeavor
> to influence, intimidate or impede any juror, witness or officer in any court
> of this State, in the discharge of his duty, or shall corruptly, or by threats or
> force, obstruct or impede, or endeavor to obstruct or impede the due
> administration of justice therein, every person or persons so offending shall
> be liable to be prosecuted therefor by indictment, and shall on conviction
> thereof be punished by fine, not exceeding five hundred dollars, or by
> imprisonment not exceeding three months, or both, according to the nature
> and aggravation of the offence.

[32] Prior to its recodification in 2002, the statute stated:

> If any person by corrupt means or by threats or force endeavors to influence,
> intimidate, or impede any juror, witness, or court officer of any court of this
> State in the discharge of his duty, or by corrupt means or by threats or force
> obstructs, impedes, or endeavors to obstruct or impede the due administration
> of justice therein, he is liable to be prosecuted[.]

Art. 27, § 26 (1957, 1996 Repl. Vol., 2001 Supp.).

In 2002, as part of the code recodification process, the General Assembly recodified former Article 27 into a newly created Criminal Law Article.[33] The General Assembly separated the witness and juror intimidation provisions from the obstruction of justice provisions, creating two separate statutory offenses.[34] The former provisions of Article 27 that addressed witness and juror intimidation were codified as CR § 9-305(a). The Revisor's Note for CR (2002) § 9-305 stated, in pertinent part, that "[t]his section is new language derived without substantive change from former Art. 27, § 26, as it referred to intimidating or corrupting a juror."

The statute has two prongs relevant to our analysis. First, a violation must involve an attempt to "influence, intimidate, or impede" a juror "in the performance of the [juror's] official duties." Second, the attempt must be by "threat, force, or corrupt means[.]"

Ms. Rovin asserts that the prosecutor's interpretation of the juror intimidation statute was incorrect—and therefore unreasonable—because the foreperson was no longer a "juror" within the meaning of the statute once the jury rendered the verdict. She also contends that her interaction with the foreperson could not have constituted an attempt to influence, intimidate, or impede the "performance of [his] official duties," because those duties ended once the jury returned its verdict in her daughter's trial.

---

[33] *See* 2002 Md. Laws 197 (Vol. I, Ch. 26, H.B. 11).

[34] The provisions of former Article 27, § 26 that addressed obstruction of justice were recodified in CR § 9-306(a), which states that "[a] person may not, by threat, force, or corrupt means, obstruct, impede, or try to obstruct or impede the administration of justice in a court of the State." The Revisor's Note for CR (2002) § 9-306 stated, in pertinent part, that "[t]his section is new language derived without substantive change from former Art. 27 § 26, as it related to obstructing justice."

At Ms. Rovin's trial, the prosecutor disagreed with Ms. Rovin's narrow interpretation of the statute. The State's Attorney's Office's interpretation, as outlined in the application for charges, and as argued to the trial judge, was that the foreperson was a "juror" for the duration of his term on the jury panel, and that his "official duties" extended for the period of his jury summons. Under that interpretation, the attempt to threaten or intimidate a juror is not limited to a particular trial but extends to the juror's official duties for the duration of the juror's summons.

Examining the plain language of the statute, it does not define "juror," nor does it specify a juror's "official duties." One interpretation—the one advanced by Ms. Rovin—is that "juror" means a member of a sworn jury seated on a particular trial and that a juror's duties conclude upon the entry of a verdict. Another interpretation—the one asserted by the State's Attorney's Office—is that "juror" means an individual summoned for jury service, and that a juror's "official duties" are coextensive with the period of the juror's summons. Under these competing interpretations, the scope of a juror's "official duties" is dependent upon whether the term "juror" means a sworn juror, or a member of the jury pool or panel that is subject to the summons for a particular duration.

Common usage of the term "juror" supports both interpretations. Black's Law Dictionary defines "juror" *both* narrowly—"[a] member of a jury"—and broadly—"a person serving on a jury panel." *Juror*, Black's Law Dictionary (11th ed. 2019). The term "panel" similarly includes both an expansive *and* a narrow definition. "Panel" is defined as both "[a] list of persons summoned as potential jurors;" with a cross-reference to the term "venire," *and* as "[a] group of persons selected to serve on a jury[.]" *Panel*, Black's

Law Dictionary (11th ed. 2019). The term "jury panel" simply cross-references the term "venire." *Jury Panel*, Black's Law Dictionary (11th ed. 2019). "Venire" is defined as "[a] panel of persons selected for jury duty and from among whom the jurors are to be chosen." *Venire*, Black's Law Dictionary (11th ed. 2019). Indeed, this Court sometimes refers to members of a jury venire simply as "jurors." *See, e.g.*, *Wright v. State*, 411 Md. 503, 512–14 (2009). Because the term "juror" is susceptible to more than one reasonable interpretation, we determine that it is ambiguous. In an effort to ascertain the Legislature's intent, we turn to the overarching statutory scheme for jury selection and service in Maryland.

### 2. Jury Selection in Maryland—The Overarching Statutory Scheme

The Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee a defendant charged with qualifying crimes the right to a fair and impartial jury—a right that is sometimes traced to the Magna Carta. *Duncan v. Louisiana*, 391 U.S. 145, 151–52 (1968). A civil litigant's right to a jury trial is guaranteed by Article 23 of the Maryland Declaration of Rights. The Legislature has implemented these constitutional directives through statutory provisions governing the way juries are to be selected.

### a. The Current Jury Selection Statute

In 1969, Maryland adopted a uniform and comprehensive statute governing jury selection.[35] These statutory provisions are currently set forth in Title 8 of the Courts and

---

[35] *See* 1969 Md. Laws, ch. 408.

Judicial Proceedings Article (sometimes hereinafter referred to as the "jury selection statute"). Md. Code Ann., Courts and Judicial Proceedings Article ("CJ") § 8-101, *et seq.* (1984, 2021 Repl. Vol., 2022 Supp.). The jury selection statute states that every adult citizen in the State has not only an "opportunity for jury service," but a corresponding "duty to serve" when summoned for service. *Id.* § 8-102. The limited grounds of disqualification from jury service are set forth in CJ § 8-103.

Each circuit court is required to have "a written plan for jury selection and service in accordance with the requirements of [the] title." *Id.* § 8-201. The statute establishes certain required provisions that each jury plan must include, such as intervals for the creation of a prospective jury pool and a qualified jury pool, *see* CJ § 8-207, a method by which summonses for jury service are to be served, *see id.* § 8-208, juror qualification forms, *see id.* § 8-212, provisions for the disqualification, excusal, exemption, or rescheduling of jury service by a prospective or qualified juror for specified reasons permitted under the statute, *see id.* § 8-215, and frequency of service, *see id.* § 8-216. "A person who is summoned for jury service" "may not fail to complete jury service as directed." *Id.* § 8-505(a). An individual who fails to comply with a jury summons and fails to show good cause is subject to a fine not exceeding $1,000 or imprisonment not exceeding 90 days, or both. *Id.* § 8-505(c).

The jury selection statute does not define "juror" but does include definitions of "[p]rospective juror"[36] and "[q]ualified juror,"[37] and uses terms such as "sworn juror" and "grand juror." Although the current jury selection statute does not use the word "juror" in isolation without an adjective that provides additional parameters, we observe that, in at least one instance, the Legislature uses the term "jury" to broadly refer to the jury panel or venire. Specifically, CJ § 8-104 states that "[e]ach *jury for a county* shall be selected at random from a fair cross section of the adult citizens of this State who reside in the county." (Emphasis added). In this instance, the term "jury" is synonymous with the venire, *i.e.,* the prospective jurors from which a grand jury or particular trial jury are to be chosen.[38]

In our review of the statutory history of the jury selection statute, we observe that the adjectives that are used to describe jurors in their various stages of jury service—such as "qualified" or "prospective" jurors—did not appear until 2006.[39] It is therefore useful to examine the historical context of the General Assembly's usage of the word "juror" and

---

[36] A "[p]rospective juror" "means an individual whose name is selected from a source pool but who has not yet been screened for disqualification, excusal, or exemption." CJ § 8-101(d).

[37] A "[q]ualified juror" "means an individual who, after selection as a prospective juror, is not disqualified, excused, or exempted." CJ § 8-101(e); *see also id.* § 8-309.

[38] As we mentioned, this Court also occasionally uses the word "juror" to refer to members of a jury venire. *See Wright v. State*, 411 Md. 503, 512, 514 (2009); *cf. Kidder v. State*, 475 Md. 113, 124 n.1 (2021) (explaining that "[t]erms such as 'jury pool,' 'jury panel,' 'venire,' 'prospective juror,' and 'qualified juror' are sometimes used interchangeably in certain contexts to mean the same group or individuals and are sometimes used in other contexts to mean different subsets of groups or individuals").

[39] *See* 2006 Md. Laws, ch. 372.

consider the context of a juror's "duties" as those terms were used prior to the introduction of the current terminology.

b.     Jury Selection in Maryland – Some Statutory History

Prior to the mid-1960s, Maryland, like most court systems, used a "keyman" system in selecting jurors.[40]    Under this system, the clerk of the court and the county jury commissioner were responsible for selecting potential jurors.    Although there were variations in the jury selection statutes (for example, changes that permitted women to serve on juries), the overall process remained unchanged for over a century.  *Compare* Acts of 1867, ch. 329, *with* Md. Code Ann., Art. 51 (1957, 1968 Repl. Vol.).  Given that this case arose in Wicomico County, we will focus our discussion and analysis on the statutory provisions governing jury selection in that county as set forth in Article 51 of the Maryland Code prior to its repeal in 1973.[41]

In the first judicial circuit, the clerk of the county commissioners, or the county council (as the case may be), furnished a list of "taxable inhabitants or residents" of the county to the judges of the circuit.  Article 51, § 6.  From this list, prior to the beginning of

---

[40] For a more detailed discussion of the "keyman system," see Richard Seltzer, John M. Copacino, & Diana Roberto Donahoe, *Fair Cross-Section Challenges in Maryland: An Analysis and Proposal*, 25 U. Balt. L. Rev. 127 (1996).  Baltimore City's keyman system in the 1920s is described by Clarence N. Callendar, *The Selection of Jurors: A Comparative Study of the Methods of Selection and the Personnel of Juries in Philadelphia and Other Cities*, at 71–72 (1924) (Ph.D. Thesis, University of Pennsylvania). *See also United States v. Cohen*, 275 F. Supp. 724, 729–30 (D. Md. 1967) (Judge Frank A. Kauffman describing the federal keyman system).

[41] As part of the State's code revision process, Article 51 was repealed in 1973 and recodified as Title 8 of the Courts and Judicial Proceedings Article. *See* 1973 Md. Laws, ch. 2, § 2.

each court term, the judges of each circuit selected a jury panel for the court's term.[42] The statute provided for the selection of jurors by a ballot system. *Id.* § 10A(a).[43] The names from the list were printed on individual ballots and placed into a jury box. *Id.* A clerk or deputy would then withdraw ballots "as the judges shall determine appropriate until the *number of jurors deemed necessary by the judges, for the ensuing term of court, has been drawn*[.]" *Id.* (emphasis added). The individuals identified by ballot were recorded by the clerk in the order drawn, and thereafter, the judges ordered "a venire facias directed to the sheriff," "*commanding him to summon as jurors to attend at the next ensuing term of said court,* the several persons whose names shall be drawn as aforesaid[.]" *Id.* (emphasis added).

Of the "jurors drawn and summoned," the court would then appoint a grand jury and its foreperson, and the "remaining names . . . constitute[d] the petit jury or juries for said term of the court[.]" *Id.* § 12A. Over the term, the court had the discretion to "excuse any one or more of those selected as petit jurors" and to rebuild the panel by drawing names

---

[42] The names selected for the panel were to be "fairly and impartially selected," "with special reference to the intelligence, sobriety and integrity of such person and without the least reference to political opinion[.]" Art. 51, § 10.

[43] The statute gave the courts in the first judicial circuit the option of utilizing either the "ballot system" or the "marble or ball system" "as may be most convenient and satisfactory to the judge or judges drawing a jury." Art. 51, § 10A(b). Under the marble or ball system, each name on the list was assigned a number that corresponded to a number on a marble or ball that was placed in a jury box. *Id.* The marble and ballot system were the same insofar as the clerk or designated individual would withdraw either a ballot or a marble out of the jury box, and the names withdrawn from the box would constitute the jury panel or venire for that particular court term. Because the process was the same under either system, for ease of discussion, we shall focus on the ballot system.

from the jury box. *Id.* § 15. Additionally, if any "panel or petit jurors" served "for a reasonable period of time," the judge had the authority to "excuse said panel from further service and draw from the jury box" another "panel which shall serve until excused by the court, or until the beginning of the next jury term." *Id.*

When the "jurors for any term of the court" had "been drawn" and the business of the term had proceeded such that their daily services or attendance were no longer necessary, the statute provided that "said *juries shall not be finally discharged*" but instead, they were "excused from further service" until they were needed again. *Id.* § 28 (emphasis added). The court had "the power and authority to recall the grand or petit jurors" "at any time" in the judge's discretion "within [the] jury term, and until the beginning of the next succeeding jury term" of the court.[44] *Id.* Furthermore, the court had the "full power and

---

[44] Article 51, § 28 provided in pertinent part:

Whenever the *jurors for any term of court* in the counties of this State *have been drawn* . . . and the business of said term has so far proceeded that the daily services and attendance of either the grand jury or the petit jury, or both . . . shall no longer be no longer necessary, *said juries shall not be finally discharged*, but shall be excused from further service for the time being until said jury or juries are reconvened for intermediate sessions . . . for the balance of said jury term[.] . . . *The court, or a judge thereof, shall have the power and authority to recall the grand or petit jurors*, or both, in special session at any time in his discretion within said jury term, and *until the beginning of the next succeeding jury term of said court, for indictments or trials, or both, as the case may be.*

* * *

In the event the work in any county awaiting the grand or petit juries, or both, is sufficient to justify assembling both or either in the judgment of the court, the court shall so inform the clerk of the circuit court for said county and said

56

authority to coerce the attendance of jurors drawn and summoned" and to punish jurors "by fine or imprisonment or both," as well as to find them in contempt for disregarding the summons. *Id.* § 16.

As the above discussion reflects, in prior versions of the jury selection statute, the Legislature used the term "juror" to refer to individuals whose names were drawn from the jury box and selected for jury service for the court's term. Moreover, the juror's "duties" were not limited to simply sitting on a particular trial. Instead, they were not "discharged" from performing their duties until the conclusion of the term. They could be recalled "at any time" and were subject to the court's summons until the conclusion of the term. Given the broad use of the term "juror" and the general description of the juror's duties as being co-extensive with the court's term, we conclude that a reasonable interpretation of the juror intimidation statute is that it was intended to apply to members of the jury panel for the particular court term, and to cover all of the juror's duties—and was not limited to service on a particular trial.

> 3. *This Court's Case Law Discussing Witness Intimidation and Obstruction of Justice Does Not Compel a Narrow Interpretation of the Juror Intimidation Statute*

As noted above, this Court has not had an occasion to interpret the meaning of "juror" and a juror's "official duties" within the context of the juror intimidation statute. Ms. Rovin asserts that, to the extent the statute is ambiguous, this Court's decisions in

---

clerk shall notify said jurors by mail at least five days before the day upon which their attendance shall be needed in intermediate session.

(Emphasis added).

*Romans v. State*, 178 Md. 588 (1940) and *State v. Pagano*, 341 Md. 129 (1996) support her narrow interpretation. For the following reasons, we disagree.

As discussed above, prior to the General Assembly's 2002 code recodification of Article 27, the former version of the statute contained two prongs. The first prong involved witness and juror intimidation. The second prong embraced various forms of obstruction of justice. In *Romans* and *Pagano*, we discussed the scope of the "obstruction of justice" prong.

In *Romans*, the defendants were charged with obstruction of justice and witness intimidation for allegedly attempting to get a witness to leave Baltimore City during the trial in which the witness was to testify. 178 Md. at 591–93. We held that the conduct violated both prongs of the statute. We stated:

> The statute is in aid and definition of a class of those criminal acts which are known to the common law as obstructions of justice. The words of the statute are general and embrace in comprehensive terms various forms of obstruction. Thus[,] the particular acts are not specified but, whatever they may be, if the acts be corrupt, or be threats or force, used in an attempt to influence, intimidate, or impede any juror, witness or officer *in any court* of the State in the discharge of his duty, there is an obstruction of justice.

*Id.* at 592 (emphasis added).

In *Pagano*, we were asked to determine "whether lying to a police officer during an investigation and before the initiation of judicial proceedings and instructing others to do the same constitutes an obstruction of justice" under the second prong of Article 27, § 26. 341 Md. at 131. We determined that it did not because the conduct occurred prior to the initiation of any judicial proceeding. *Id.* at 135. The State argued that the second prong of the statute—*i.e.*, conduct affecting the "administration of justice"—should be construed

broadly to include police investigations before the initiation of any judicial proceeding. *Id.* at 135–36. We examined the legislative history and concluded that "the [L]egislature originally intended the terms 'administration of justice' in § 26 to require a nexus to the court system and did not intend for those terms to refer generally to the legal system." *Id.* at 135. We observed that in other cases, we determined that, "[i]rrespective of the identity of the immediate victim, the ultimate victim is inevitably the court." *Id.* at 137 (quoting *Pennington v. State*, 308 Md. 727, 735 (1987)). In conclusion, we held "that the term 'therein' in the second prong of § 26 refer[red] to 'any court of this State'" and therefore the statute prohibited "only actions aimed at obstructing or impeding a judicial proceeding." *Id.* at 139.

Ms. Rovin argues that these cases support a narrow interpretation of the juror intimidation statute. In support thereof, she seizes on the term "in any court of this State" in *Romans*, 178 Md. at 591, and the language in *Pagano* requiring that acts constituting witness intimidation be associated with a "pending judicial proceeding[,]" *Pagano*, 341 Md. at 135. We disagree that these cases support Ms. Rovin's narrow interpretation.

*First, Pagano* and *Romans* involved attempting to obstruct a witness in connection with a witness's "official duties"—not conduct against a juror in connection with the juror's "official duties." A *witness's official duties* in connection with giving testimony in a particular judicial proceeding are different from a *juror's official duties* in connection

59

with a jury summons requiring attendance during the period of the summons.[45] *Second*, the broad interpretation of "juror" that was advanced by the prosecutors at Ms. Rovin's trial was consistent with the language in these cases. Unlike the conduct in *Pagano*, the conduct for which Ms. Rovin was charged had a "nexus to the courts." 341 Md. at 135. Indeed, where a victim is no longer able to remain an active member of the jury pool after the incident, "the ultimate victim is inevitably the court." *Id.* at 137 (quoting *Pennington*, 307 Md. at 735). The prosecutor's interpretation of the juror intimidation statute—in which "juror" means a member of the jury panel and the juror's "official duties" are coextensive with the juror's duties for the period of the summons—is not an interpretation divorced from the "court system" or the juror's duties in connection with the court's judicial proceedings. Nothing in these cases supports the very narrow interpretation espoused here by Ms. Rovin, particularly in light of the historically broad use of the term "juror" under the jury selection statute.

Finally, we note that another case—*Lee v. State*, 65 Md. App. 587 (1985)—provides some support for the broader statutory interpretation that the prosecutor relied upon at Ms.

---

[45] Notably, the statute prohibits a person from trying to "influence, intimidate, or impede" the "official duties" of three distinct categories of persons: a "juror," a "witness," and an "officer of a court[.]" CR § 9-305(a). Each class of individuals has distinct and independent duties in connection with the court system, and some may be broader than others. A witness's official duties may be limited to a particular trial or testimony before a grand jury; a member of a jury panel's official duties (such as the duty to appear in court for the duration of the summons when called for service) can extend throughout the period that the juror is subject to the court's summons; and an "officer of [the] court['s]" official duties may be even broader still, depending upon the type of officer and the extent of their duties. In other words, the scope of the duties is contextual to the individual who is the subject of the prohibited conduct.

Rovin's criminal trial. In that case, the defendant was convicted of obstruction of justice after he intimidated a witness. The witness had been the victim of an assault by the defendant and was scheduled to testify against the defendant in the criminal proceeding. As the witness was leaving court after appearing pursuant to a summons, the defendant confronted the witness, asked him why he had initiated charges against him and pointed a gun at him. After the defendant was convicted of witness intimidation, on appeal, the defendant argued that the State had not established that he was trying to "influence, intimidate, or impede" the witness in the discharge of his duty, and "at most," reflected a continuation of a mutual disagreement that had led to the initial assault charge. *Id.* at 589. The Appellate Court disagreed. Writing for the court, the Honorable Robert M. Bell explained that, because "no direct or express evidence of" the defendant's "intent to influence, intimidate, or impede" the witness appeared on the record, the court would "look to the circumstances surrounding the incident and the *natural and inevitable consequences of the action*." *Id.* at 592 (emphasis added). Considering the evidence through this lens, the court observed that the witness had attended the hearing, and the defendant assaulted the witness as he was returning home from the hearing only after the defendant inquired about the case. *Id.* at 594. In other words, the conviction was upheld notwithstanding that the intimidation occurred after the witness left the hearing.

### 4. *Conclusions with Respect to the Prosecutor's Statutory Interpretation*

Based upon the overall statutory scheme related to jury selection in Maryland, we determine that the prosecutor's interpretation of the juror intimidation statute was an objectively reasonable one. As noted above, the juror intimidation statute does not define

61

"juror" or specify a juror's "official duties." The statute has been in effect without substantive change since 1853. The dictionary definition of the word "juror" includes both a broad and a narrow definition, and therefore supports both interpretations. Turning to the overall statutory scheme for selecting juries in Maryland, the current jury selection statute does not use the word "juror" without adjectives such as "qualified," "prospective," or "sworn." However, in at least one instance, the Legislature uses the word "jury" to expansively mean the jury venire. *See* CJ § 8-104.

Looking at prior versions of the jury selection statute, we observe that the Legislature historically used the term "jurors" in a broad sense to refer to individuals whose names had been drawn from the jury box to serve as "jurors for any term of the court[,]" and the term was not used to refer to jurors who were serving in a particular trial. When the jurors were not needed for daily services or attendance in court, their services were not "finally discharged," but they were excused until their services were needed again.

Construing the terms "juror" and the juror's "official duties" as used in the juror intimidation statute within the context of the jury selection statutes in Maryland in effect during the same time period, we conclude that an objectively reasonable interpretation is that "juror[,]" as used in the juror intimidation statute, means an individual serving on a jury panel for the duration of the juror's summons and that the "official duties" of the juror extend beyond the juror's participation on a particular trial.[46]

---

[46] Even if we concluded that a more reasonable interpretation of "juror" was that it referred to a sworn jury and that the juror's "official duties" concluded upon the jury's discharge in a particular trial, like our colleagues on the Appellate Court, we conclude that

62

In a robust argument at the conclusion of the State's case, the prosecutor presented his statutory interpretation to the trial judge. The prosecutor disagreed with Ms. Rovin's counsel's "extremely narrow reading" of the juror intimidation statute, which limited a juror's "official duties" to "simply sitting on a single jury." The prosecutor pointed out that in Wicomico County, jurors are "under the [c]ourt's subpoena for 30 days[,]" and that

---

a reasonable interpretation of these terms could include a time-period over which the court had revisory power over the verdict. We agree with the Appellate Court that, after a verdict, and during the time-period over which a court may exercise its revisory power, it is possible that a juror might be required to testify. While it is a rare occurrence, it can happen, nonetheless.

Under Maryland Rule 5-606, commonly referred to as the "no impeachment rule," after a verdict has been rendered and accepted and the jury discharged, jurors are prohibited from giving certain testimony pertaining to jury deliberations and the influencing effect of anything on the juror's ability to deliberate and on a juror's mental processes during deliberations. This prohibition, however, typically does not extend to jurors' conduct during trial outside of deliberations. If, for example, the court or parties learned that a juror engaged in misconduct or had improper contact during the trial, it could cast doubt on whether the verdict was just and proper and require a hearing in which the juror gives testimony. *See, e.g.*, *Jenkins v. State*, 375 Md. 284, 301 (2003) (in a case involving improper contacts between a detective and a juror during trial, in which both individuals were required to testify after the verdict, we observed that "some . . . juror contacts with third parties and/or misconduct can reach a level of being presumptively prejudicial to a defendant, thus placing the burden of showing harmlessness on the State"); *see also Johnson v. State*, 423 Md. 137, 149 (2011) (explaining that in certain circumstances, "the juror misconduct is such that prejudice to the defendant must be presumed. In those situations, a mistrial (or the post-trial remedy of a new trial) is the proper remedy unless the State overcomes the presumption of prejudice"); *cf. Barnes v. Joyner*, 751 F.3d 229, 242 (4th Cir. 2014) (an evidentiary hearing is required "when the defendant presents a credible allegation of communications or contact between a third party and a juror concerning the matter pending before the jury").

as a result of Ms. Rovin's conduct, the foreperson was dismissed from his official duties as a sworn juror on June 17—prior to the expiration of his jury service on June 30.[47]

The prosecutor argued that Ms. Rovin intended to intimidate the foreperson by finding out his name, going to his workplace, and making a threat. He further asserted that

---

[47] Ms. Rovin cites CJ § 8-310(c)(2) to argue that the foreperson, "by law, was also no longer a member of the jury pool after actively serving on a jury[]" and that the foreperson "could not have been called to serve on a second jury for a three-year period." CJ § 8-310(c)(2) states:

> Except as needed to complete service in a particular case or as otherwise provided in a jury plan, an individual may not be required, in any 3-year period, to serve or attend court for *jury service* more than once.

(Emphasis added). As an initial matter, Ms. Rovin fails to cite another applicable statute—CJ § 8-216—which permits a county, in its jury plan, to modify the frequency with which individuals may be summoned for jury service to one year. The Wicomico County Jury plan has made such a modification.

Putting aside Ms. Rovin's reliance on the incorrect statute, we further observe that neither statute defines "jury service." Ms. Rovin narrowly interprets "jury service" to mean serving as a sworn juror on a particular trial. We disagree with Ms. Rovin's interpretation. Read in the context of Title 8 of the Courts and Judicial Proceedings Article, as we outlined above, "jury service" means an individual's service on a *jury panel*. *See, e.g.*, CJ § 8-401(c) ("A summons sent to an individual with a juror qualification form shall instruct the individual to report for *jury service* unless a jury commissioner instructs otherwise." (emphasis added)); CJ § 8-208 ("Each jury plan shall set the method by which summonses for *jury service* are to be served." (emphasis added)). In Wicomico County, the foreperson remained subject to a summons for "jury service" for the month of June. *See* Maryland Courts, Juror Information-Frequently Asked Questions, *available at* https://perma.cc/SX6N-VJYN (stating that "jurors may serve on multiple trials as [they] are on call for the whole month"). Sitting as a juror on a single trial jury did not extinguish the foreperson's summons, and he was required to report for jury duty in Wicomico County for the month of June.

the "natural and probable consequence" of her actions[48] was that the foreperson was unable to serve as a juror for the remainder of the month. According to the prosecutor, it was irrelevant whether Ms. Rovin intended that result—rather, what was relevant was that she "intended to intimidate him." According to the State, "[i]f she intended to intimidate him[,] she is responsible for the natural and probable consequences of her actions." The prosecutor explained that the State's interpretation of the statute required the court to determine whether "a reasonable juror who . . . had this occur could perform, could be reasonably expected to be fair and impartial, which is [a juror's] official duties for the rest of the month."

Although the trial judge accepted the narrow statutory interpretation advanced by Ms. Rovin at her criminal trial, he found it to be a "very difficult case[,]" and noted that Ms. Rovin's actions were "very improper." He ultimately concluded that the statute was not intended to apply to retaliatory conduct. Given the acquittal, his interpretation was not subject to further judicial review.[49]

---

[48] Based upon the prosecutor's arguments, he appears to have relied upon the "natural and inevitable consequences" language from *Lee v. State*, 65 Md. App. 587, 592 (1985), discussed *supra.*

[49] Although there was no opportunity for further judicial review of the trial judge's interpretation, it was the subject of legislative action. In the very next legislative session, the General Assembly enacted legislation to expand the witness retaliation statute, CR § 9-303(a)(2) to criminalize threats against a juror for participation in a "pending or completed case." *See* 2016 Md. Laws ch. 532, 533. The prosecutor in Ms. Rovin's criminal trial testified in favor of the bill. As part of his testimony, the prosecutor explained the 30-day duration of jury duty in Wicomico County. He noted that the foreperson had served on two trials during that month, and "likely [would] have serve[d] on two or three more"

In conclusion, we hold that the State's Attorney's Office's interpretation of the juror intimidation statute—which formed the basis of the application for statement of charges upon which the District Court Commissioner made a probable cause determination, and for which Ms. Rovin was tried and ultimately acquitted—was objectively reasonable.[50] Accordingly, Ms. Rovin cannot overcome the strong presumption of probable cause that attached to the warrant by establishing that "it [was] obvious that no reasonably competent officer would have concluded that a warrant should issue," *Messerschmidt*, 565 U.S. at 547.[51]

As such, in entering summary judgment in favor of the State on Ms. Rovin's common law claims of false imprisonment, false arrest, and malicious prosecution, as well as her Article 26 and Article 24 claims arising from the same conduct, the circuit court

---

during his month of service, had the court not excused him from further jury duties because of his encounter with Ms. Rovin.

[50] Given our holding that the interpretation of the juror intimidation statute contained in the application for charges upon which the warrant was issued was objectively reasonable, we also reject Ms. Rovin's conclusory assertions that the judicial officer "wholly abandoned his judicial role" or that the warrant was "facially deficient."

[51] We note that the "objectively reasonable" standard is a higher burden than the one that a law enforcement officer must satisfy to gain the benefit of the protection of an arrest warrant that attaches when a neutral magistrate issues the warrant. As we discussed above, for that protection to be removed, a plaintiff must demonstrate that one or more of the *Leon* exceptions apply. As such, we are not suggesting that a law enforcement officer would be held to the level of legal interpretive analysis outlined here to validate his or her reliance on an arrest warrant. Rather, our analysis is to demonstrate that the warrant was *not* "based on an affidavit so lacking in probable cause as to render official belief in its existence entirely unreasonable" because the interpretation of the statute that formed the basis of the application for statement of charges satisfied an even higher standard—it was objectively reasonable.

correctly ruled that the State is not civilly liable for Ms. Rovin's "arrest pursuant to a warrant based on a judicial officer's determination that probable cause existed for said arrest" even though a trial judge acquitted Ms. Rovin based upon that trial judge's interpretation of the statute. Because probable cause and legal justification existed for Ms. Rovin's arrest and imprisonment, these claims fail as a matter of law.

### H.  Ms. Rovin's Article 40 Claim

We turn next to Ms. Rovin's Article 40 claim. Ms. Rovin argues that even if the prosecutors' interpretation of the juror intimidation statute was objectively reasonable such that there was probable cause for her arrest, it cannot defeat her free speech claim under Article 40. The substance of Ms. Rovin's free speech claim is set forth in a single paragraph of her amended complaint, in which she states that: "[b]y taking and depriving [her] of her liberty against her will, and by arresting, imprisoning, and prosecuting[52] [her] based on protected speech, Defendants violated the rights guaranteed" by Article 40. Ms. Rovin appears to be making an "as applied" challenge—contending that she was arrested and imprisoned for engaging in protected speech.

We disagree with Ms. Rovin that her Article 40 claim falls outside the probable cause framework that applies when an arrest is pursuant to a warrant. In other words, just as law enforcement was entitled to rely upon the judicial officer's probable cause determination that the foreperson was a "juror" and that Ms. Rovin's conduct interfered

---

[52] Obviously, the law enforcement officers who investigated the allegations against Ms. Rovin are not responsible for the State's Attorney's Office's decision to prosecute Ms. Rovin.

with his "official duties" under the juror intimidation statute, law enforcement was similarly entitled to rely upon the probable cause determination that Ms. Rovin made a "threat," and therefore, her statements to the foreperson did not constitute protected speech.

### 1.    The True Threat Doctrine

As discussed above, the juror intimidation statute prohibits a person from, among other things, making threats against a juror. CR § 9-305. Because the statute may criminalize a form of speech, we must interpret the statute "with the commands of the First Amendment clearly in mind[,]" so that "[w]hat is a threat must be distinguished from what is constitutionally protected speech." *Watts v. United States*, 394 U.S. 705, 707 (1969). A statutory "prohibition on true threats" is constitutionally permissible regardless of whether the speaker intends to carry out the threat because, in addition to protecting people "from the possibility that the threatened violence will occur[,]" such a law "protect[s] individuals from the fear of violence and from the disruption that fear engenders[.]" *Virginia v. Black*, 538 U.S. 343,  360 (2003) (second alteration in original) (internal quotations and quotation marks omitted).

"True threats are 'serious expression[s]' conveying that a speaker means to 'commit an act of unlawful violence.'" *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (alteration in original) (quoting *Black*, 538 U.S. at 359). We have interpreted the statutory term "threat" consistent with the constitutional parameters to limit its scope to communications that convey a serious expression of intent to inflict physical harm. *See Hammonds v. State*, 436 Md. 22, 41 (2013) (identifying the plain meaning of "threat" as "a communicated intent to inflict harm[,]" *Threat*, Black's Law Dictionary (8th ed. 2004), and "[a]n expression of

68

an intention to inflict something harmful[,]" *Threat*, Webster's II New College Dictionary (3d ed. 2005) (alteration in original)); *see also Abbott v. State*, 190 Md. App. 595, 619 (2010) (in discussing the "true threat" doctrine, defining a threat "as an expression of 'a determination or intent to injure presently or in the future[,]'[53] . . . which is distinct from 'words as mere political argument, talk or jest.'" (citations omitted)).

In analyzing whether a statement is a "true threat" and therefore outside the protections of the First Amendment in the context of a criminal prosecution, "[t]he State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Counterman*, 600 U.S. at 69.

[53] Ms. Rovin cites *Bridges v. California*, 314 U.S. 252, 262 n.5 (1941) for the proposition that to avoid constitutional protection, there must be reasonable grounds to believe that the danger occasioned by the threat is *imminent*. Ms. Rovin's reliance on *Bridges* is misplaced. That case involved the application of the "clear and present danger" category of unprotected speech. *Bridges v. California*, 314 U.S. 252, 261–63 (1941). The United States Supreme Court subsequently confirmed that the clear and present danger category is separate and distinct from the true threat category, and that "restriction under the [former] category is most difficult to sustain[.]" *United States v. Alvarez*, 567 U.S. 709, 717–18 (2012). Though they may have similarities, *see Counterman*, 600 U.S. at 97 (Sotomayor, J., concurring), they are not one and the same. Ms. Rovin cites *Baltimore Radio Show v. State*, in which this Court quoted language from *Bridges* reflecting that the harm must be imminent. 193 Md. 300, 326 (1949). Like *Bridges*, however, *Baltimore Radio Show* concerned the clear and present danger test and did not involve a threat of violence. *Id.* That case is also inapposite for the same reason as *Bridges*.

We further observe that the Appellate Court's articulation of a true threat—a determination or intent to injure *presently or in the future*—is consistent with the true threat standard utilized by other courts. *See, e.g.*, *United States v. Turner*, 720 F.3d 411, 424 (2d Cir. 2013) (rejecting the argument that a true threat must be imminent); *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996) (stating that a true threat expresses "a determination or intent to injure presently or in the future"); *Connecticut v. Pelella*, 170 A.3d 647, 653-54 (Conn. 2017) (holding that imminence is not required for a statement to be a true threat); *Harrell v. Georgia*, 778 S.E.2d 196, 200 (Ga. 2015) (stating that the "threatened violence need not be imminent").

However, "[w]hether the speaker is aware of, and intends to convey, the threatening aspect of the message is not part of what makes a statement a threat[.]" *Id.* at 74 (citing *Elonis v. United States*, 575 U.S. 723, 733 (2015)). "The existence of a threat depends not on the mental state of the [speaker], but on what the statement conveys to the person on the other end." *Id.* (citation and internal quotations omitted). This is because "[w]hen the statement is understood as a true threat, all the harms that have long made threats unprotected naturally follow." *Id.*

The determination as to whether speech is a true threat must include a consideration of its context. *See Watts*, 394 U.S. at 708; *Abbott*, 190 Md. App. at 620 (observing that "[w]hether a particular communication constitutes a true threat depends on both its language and its context"). "[T]he context in which the words were" communicated, "the specificity of the threat," and the "reaction of a reasonable recipient familiar with the context" in which the words were spoken are "factors which must be considered" in determining whether the communication was a "true threat." *Abbott*, 190 Md. App. at 620 (internal quotation marks omitted) (quoting *United States v. Roberts*, 915 F.2d 889, 890–91 (4th Cir. 1990)).

### 2. *The Judicial Officer Had Probable Cause to Believe that Ms. Rovin's Statement was a True Threat*

Examining the application for statement of charges, we determine that the judicial officer had probable cause to believe that Ms. Rovin's statement to the foreperson did not implicate any protected speech. Once again, we note that Ms. Rovin has not alleged that Deputy Cook make material omissions or misstatements of fact in the arrest warrant

70

application. Although she disagrees with the foreperson's account of the events, she does not allege that Deputy Cook falsely recounted those events in the application for charges as those events were reported to him by the foreperson.

According to the application for statement of charges, the foreperson reported that Ms. Rovin invaded his personal space "to the point where he felt uncomfortable and threatened." Prior to leaving, she "threatened" the foreperson by telling him that "Bill Rovin" would "take care of him." Ms. Rovin claimed that Bill Rovin "worked in Nicaragua" and had people that will "take care of him." The foreperson felt this statement "was an indirect death threat."

It was certainly objectively reasonable for the neutral judicial officer who issued the warrant to determine that Ms. Rovin's statements as conveyed by the foreperson constituted a "threat," i.e., an expression of a determination or intent to injure presently or in the future, particularly in light of both the language and the context in which the statement was made. Ms. Rovin went to the foreperson's workplace on the same day as her daughter's trial, acted in a loud and threatening manner, and invaded his personal space. The foreperson found Ms. Rovin's statement that "Bill Rovin" would take care of him to be sufficiently threatening and alarming that he contacted the State's Attorney's Office and applied for a peace order. In other words, it was objectively reasonable for a judicial officer to find probable cause that Ms. Rovin consciously disregarded a substantial risk that her communication would be viewed as threatening violence, and that the foreperson reasonably understood the statement to be a true threat.

71

Based upon our examination of the application for statement of charges, we hold that in issuing the warrant, the judicial officer had probable cause to believe that Ms. Rovin made a true threat that was outside the protections of Article 40. Law enforcement was entitled to rely upon the probable cause determination in making the arrest.

### I.    Ms. Rovin's Article 24 Void-For-Vagueness Claim

Finally, Ms. Rovin also asserts that her rights under Article 24 were violated regardless of whether there was probable cause for her arrest because she was arrested pursuant to an unconstitutionally vague statute. She contends that if the juror intimidation statute is susceptible to more than one reasonable interpretation, it must be void for vagueness.

In determining whether a statute is constitutional, we start with a presumption that the statute is valid. *Galloway v. State*, 365 Md. 599, 611 (2001) (citations omitted). To assess whether a statute is void for vagueness, we consider whether it: (1) "fails to give ordinary people fair notice of the conduct it punishes," or (2) is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also Galloway*, 365 Md. at 615. "The standard for determining whether a statute provides fair notice is whether persons of common intelligence must necessarily guess at the statute's meaning." *Galloway*, 365 Md. at 615 (cleaned up). "A statute is not vague under the fair notice principle if the meaning 'of the words in controversy can be fairly ascertained by reference to judicial determinations, the common law, dictionaries, treatises or even the words themselves, *if* they possess a common and generally accepted meaning.'" *Id.* (quoting *Bowers v. State*, 283 Md. 115, 125 (1978)); *see also Eanes v. State*, 318 Md.

72

436, 461 (1990) ("[W]e . . . apply normal meanings to words of common understanding[.]"). When interpreting criminal penal statutes, we have construed them through the lens of a reasonable person standard. *Galloway*, 365 Md. at 634. Moreover, "'the vagueness doctrine does not require absolute precision or perfection.'" *McCree v. State*, 441 Md. 4, 20 (2014) (quoting *Galloway*, 365 Md. at 634). A statute "'does not become unconstitutionally vague merely because it may not be perfectly clear at the margins.'" *Galloway*, 365 Md. at 634 (quoting *Williams v. State*, 329 Md. 1, 11 (1992)).

Ms. Rovin does not suggest that the words used in the juror intimidation statute are too complicated or difficult as to escape ordinary meaning. Indeed, she contends quite the opposite—that it was, or should have been, clear beyond a reasonable doubt that she did not violate the statute, and therefore, she should not have been arrested, imprisoned, or prosecuted for allegedly doing so. Nor does she set forth any genuine argument that the statute is "so standardless such that it invites arbitrary enforcement."[54] Instead, in her view, any statute that is susceptible to more than one objectively reasonable interpretation is *per*

---

[54] In discussing the arbitrary enforcement prong, we have explained:

> a criminal statute is [not] void merely because it allows for the exercise of some discretion on the part of law enforcement and judicial officials. It is only where a statute is so broad as to be susceptible to irrational and selective patterns of enforcement that it will be held unconstitutional under this second arm of the vagueness principle.

*Bowers v. State*, 283 Md. 115, 122 (1978) (citation omitted). The juror intimidation statute is not "so broad as to be susceptible to irrational and selective patterns of enforcement[.]" *Id.* To the contrary, the statute coherently sets forth the types of individuals it protects and expressly limits its application to the performance of those individuals' "official duties." Simply put, law enforcement, juries, and courts are not able to selectively enforce the statute based upon their idea of who a "juror" is or what a juror's "official duties" are.

73

*se* unconstitutionally vague.  We disagree.  We have determined that the prosecutor's interpretation of the juror intimidation statute was objectively reasonable.  That a trial judge reached a different statutory interpretation does not make it void *per se*.  If that were the case, each time that a trial judge enters a motion for judgment of acquittal in a criminal case based upon his or her interpretation of the statute, it would be deemed unconstitutionally void for vagueness.  In such instances, there is no opportunity for appellate review to determine the legal soundness of the trial court's ruling.  Had there been appellate review of the trial judge's narrow interpretation of the juror intimidation statute here, it may have led to a different (and much less favorable) result for Ms. Rovin.

Applying the above standards, we hold that the juror intimidation statute is not unconstitutionally vague.  The statute, which has been in effect for over 150 years, uses words or phrases that have a common meaning and understanding known to persons of common intelligence.  It is certainly reasonable for an individual in Ms. Rovin's situation to recognize the potential criminality of her conduct—traveling to a juror's workplace within hours of her daughter's verdict in a criminal trial, and according to the foreperson, telling him that an individual is going to come "take care of him."  Indeed, as her attorney argued at her criminal trial, if one accepts what the foreperson told the deputy, she went there to "threaten that somebody else would come and do harm[]" and "she underst[ood] better than anyone that she shouldn't have done this[.]"  Her defense was simply that the foreperson was no longer a "juror" within the definition of the statute, thereby excusing her conduct.  As noted above, "a statute does not become unconstitutionally vague merely

74

because it may not be perfectly clear at the margins." *Galloway*, 365 Md. at 634 (cleaned up).

# V

## Conclusion

For the reasons discussed above, we hold as follows:

A.      The circuit court did not err in entering summary judgment in favor of the State on counts alleging false arrest (Count I), false imprisonment (Count II), malicious prosecution (Count III), and violations of Article 26 (Count VI) and Article 24 (Count IV) (as that count pertains to conduct alleging false arrest, false imprisonment, and malicious prosecution).  Ms. Rovin was arrested pursuant to a warrant issued by a neutral judicial officer based on an application for statement of charges for which the deputy sought legal advice from the State's Attorney's Office.  Under the facts of this case, Ms. Rovin cannot overcome the strong presumption of probable cause that attached to the warrant by establishing that "it [was] obvious that no reasonably competent officer would have concluded that a warrant should issue," *Messerschmidt*, 565 U.S. at 547.  The State's Attorney's Office's interpretation of the juror intimidation statute—which formed the basis of the application for statement of charges upon which the District Court Commissioner made a probable cause determination, and for which Ms. Rovin was tried and ultimately acquitted—was objectively reasonable.  Given the presence of probable cause and legal justification, Ms. Rovin's false arrest, false imprisonment, and malicious prosecution claims, and her attendant constitutional claims, fail as a matter of law.

B.      Summary judgment was proper on Ms. Rovin's Article 40 claim (Count V) and Article 24 claim (as that claim pertains to an assertion that Ms. Rovin's free speech rights were violated).   Based upon the application for statement of charges that was presented to the judicial officer, the judicial officer had probable cause to determine that Ms. Rovin's statements to the foreperson constituted a "true threat" and did not constitute protected speech.

C.      Summary judgment was proper on the remainder of Ms. Rovin's Article 24 claim (Count IV).   The juror intimidation statute is not unconstitutionally vague. Additionally, there was probable cause and legal justification for Ms. Rovin's arrest.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED; COSTS IN THIS COURT TO BE PAID BY PETITIONER.**

Circuit Court for Wicomico County
Case No. C-22-CV-17-000326

Argued: February 6, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 19

September Term, 2023

_____

VALERIE ROVIN

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed: August 15, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to the Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I dissent. This case involves the allegation by Ms. Rovin that she was arrested based on a mistake as to probable cause for her arrest. I would conclude that, on remand, the Circuit Court for Wicomico County erred in granting summary judgment in the State's favor as to Ms. Rovin's common law and constitutional claims on the ground that the holding of Supreme Court of the United States in United States in <u>Heien v. North Carolina</u>, 574 U.S. 54 (2014) applied and therefore the officers responsible for her arrest had no civil liability.[1] I would not decide the matter on a ground other than the one that the circuit court did and for which we remanded the case in <u>State v. Rovin</u>, 472 Md. 317, 373-74, 246 A.3d 1190, 1222-23 (2021).

In <u>Rovin</u>, <u>id.</u> at 373, 246 A.3d at 1223, we determined that the case should be remanded to the circuit court for consideration of whether the holding of Supreme Court of the United States in United States in <u>Heien v. North Carolina</u>, 574 U.S. 54 (2014) applied to the circumstances of the case. We determined that the remand was warranted because the State had not raised an issue with respect to the applicability of <u>Heien</u> when summary judgment was granted but had nonetheless relied on the case before this Court. <u>See</u> <u>Rovin</u>, 472 Md. at 371-73, 246 A.3d at 1221-23. We, therefore, remanded the case for the specific purpose of having the circuit court consider the applicability of the Supreme Court of the United States's holding in <u>Heien</u>. We stated that we remanded "the case to the circuit court for a determination as to whether <u>Heien</u> is applicable to the circumstances

---

[1]Ms. Rovin alleged common law claims of false arrest, false imprisonment, and malicious prosecution, and violations of Article 26 and Article 24 of the Maryland Declaration of Rights.

of this case." Rovin, 472 Md. at 373, 246 A.3d at 1223.  There was no other instruction or

purpose for the remand on the issue of the officers' liability for having sought and enforced

a warrant for Ms. Rovin's arrest.

On remand, the circuit court based its decision on Heien only and in its order stated:

> Having reviewed the opinion in State v. Rovin, 472 Md. 317 (2021), as well as the written and oral arguments of counsel, this Court is of the opinion that the decision of the U.S. Supreme Court in Heien v. North Carolina, 574 U.S. 54 (2014) applies to the facts presented in this case. Accordingly, neither Deputy Matthew Cook nor Sheriff Michael Lewis can be civilly liable for Plaintiff's arrest pursuant to a warrant based on a judicial officer's determination that probable cause existed for said arrest even though that determination was later held by a trial court judge to be based on an error of law.

In Rovin, id. at 369-70, 246 A.3d at 1220-21, we described the holding in Heien as

follows:

> Heien, 574 U.S. at 57, 135 S. Ct. 530, is a criminal case in which the Supreme Court held that the reasonable articulable suspicion necessary to support a traffic stop can be based on a reasonable mistake of law.  In Heien, a law enforcement officer stopped a vehicle because one of its two brake lights was out.  See id.  The defendant filed a motion to suppress, which a trial court denied after conducting a hearing at which the officer testified. See id. at 58, 135 S. Ct. 530.  The Court of Appeals of North Carolina reversed, concluding that driving with one working brake light did not violate the relevant North Carolina statute.  See id. at 58-59, 135 S. Ct. 530.  The Supreme Court of North Carolina reversed the judgment of the Court of Appeals and determined that the officer's mistake of law was reasonable. See id. at 59, 135 S. Ct. 530.

> The Supreme Court of the United States affirmed the judgment of the North Carolina Supreme Court and concluded that reasonable suspicion for a stop may be based on a law enforcement officer's reasonable mistake of law.  See id. at 67-68, 135 S. Ct. 530.  The Supreme Court observed that it had previously held that a search or seizure based on a mistake of fact can be reasonable, and thus not violate the Fourth Amendment.  See id. at 61, 135 S. Ct. 530.  The Supreme Court determined that the same should be true of a search or seizure based on a mistake of law, stating:

- 2 -

> [R]easonable men make mistakes of law, too, and such mistakes are no less compatible with the concept of reasonable suspicion. Reasonable suspicion arises from the combination of an officer's understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground. Whether the facts turn out to be not what was thought, or the law turns out to be not what was thought, the result is the same: The facts are outside the scope of the law. There is no reason, under the text of the Fourth Amendment or our precedents, why this same result should be acceptable when reached by way of a reasonable mistake of fact, but not when reached by way of a similarly reasonable mistake of law.

On remand, the circuit court did exactly what it was instructed by to do. The circuit court considered the Supreme Court's holding in <u>Heien</u> and, as a result, granted summary judgment in favor of the State, determining that <u>Heien</u>'s mistake of law analysis applied. The Appellate Court of Maryland affirmed the judgment of the circuit court. Ms. Rovin petitioned a writ of *certiorari*, which we granted with respect to six questions, the first three of which are:

> I. Whether the [Appellate Court of Maryland ("ACM")] erred in concluding that the "objectively reasonable" mistake of law test articulated by the Supreme Court in *Heien v. North Carolina*, 574 U.S. 54 (2014), applies to civil constitutional tort claims arising under the Maryland Constitution, including Article 26 of the Maryland Declaration of Rights?

> II. Whether the ACM erred in concluding that the "objectively reasonable" mistake of law test articulated in *Heien* applies to claims arising under Maryland's common law, such as for false arrest, false imprisonment, and malicious prosecution?

> III. Whether the ACM erred in determining that the officers in Ms. Rovin's case made an objectively reasonable mistake-of-law in arresting,

imprisoning, and prosecuting her and that, as a result, Ms. Rovin's claims failed as a matter of law?[2]

Despite the circuit court having granted summary judgment based exclusively on the Supreme Court's decision in Heien, the Majority holds: "We determine that consideration of the claims presented here should be analyzed under this Court's and the United States Supreme Court's framework for determining probable cause, and in particular, probable cause to arrest when a warrant is issued." Maj. Slip Op. at 22-23 (citations omitted). "It is therefore unnecessary for us to consider whether we adopt the Supreme Court's *Heien* analysis when considering an Article 26 claim. We shall save that question for another day." Maj. Slip Op. at 24 (footnotes omitted). The takeaway from the Majority's opinion is that it declined to review the ground on which the circuit court granted summary judgment and also declined to address the questions presented by Ms. Rovin on *certiorari*. Had the Majority addressed the basis of the circuit court's ruling, the outcome of the case would have been different because the Supreme Court's holding in Heien does not apply to the circumstances of this case. The Supreme Court's holding in

---

[2]The remaining questions are:

IV. Whether the ACM erred in determining that the juror intimidation statute in Criminal Law Article §9-305(a) was not unconstitutionally vague, in violation of the due process protections guaranteed by Article 24 of the Maryland Declaration of Rights?

V. Whether the ACM erred in determining that Ms. Rovin's free speech rights under Article 40 of the Maryland Declaration of Rights were not violated?

VI. Whether the warrant issued for Ms. Rovin's arrest was invalid based on the contents of the warrant affidavit, which show no crime was committed?

Heien did not address whether police officers are entitled to an exemption from civil liability based on a mistake of law as to probable cause in applying for an arrest warrant, and the circuit court's grant of summary judgment in favor of the State on that ground was erroneous.[3]

Despite the circuit court's ruling and the Majority's avoidance of the issue, it is clear that the holding of the Supreme Court of the United States in Heien, 574 U.S. 54, does not apply to the officers' conduct in this case as the question raised is vastly different from that which the Supreme Court addressed in Heien. The issue in Heien concerned the reasonable suspicion necessary for a traffic stop and did not involve any issue as to an officer's civil liability. The analysis employed by the Supreme Court in Heien demonstrates that its holding would not transfer to excuse a law enforcement officer's civil liability for a mistake of law as to probable cause for an arrest.

Nowhere in Heien did the Supreme Court state, indicate, or imply that its holding concerning the reasonable suspicion necessary for a traffic stop translated into an

---

[3]Of Heien, the Majority states:

> We decline the State's invitation to import the United States Supreme Court's *Heien* analysis here for a simple reason. That case involved an officer's *reasonable suspicion* to stop a vehicle based upon the officer's objectively reasonable belief that a motor vehicle law had been violated. In other words, *Heien* applied a constitutional framework to an officer's determination of reasonable suspicion in the field without the benefit of a warrant issued by a neutral judicial officer. In contrast, this case involves a *probable cause* determination by a *judicial officer* in connection with the *issuance of an arrest warrant*.

Maj. Slip Op. at 22 (emphasis in original).

- 5 -

exemption from civil liability on summary judgment for an officer who allegedly sought an arrest warrant or made an arrest based on a mistake of law as to probable cause.  In Heien, 574 U.S. at 67, in evaluating whether a mistake of law could negate reasonable suspicion for a stop, the Supreme Court noted that a mistake of law cannot justify imposition or non-imposition of criminal liability.  In the context of reasonable suspicion, the Supreme Court explained that because a mistake of law cannot justify the imposition or non-imposition of criminal liability, it does not follow that a mistake of law cannot justify an investigatory stop.  See id.  This leaves no room for the conclusion that Heien translates into a holding that a mistake of law can justify the imposition or non-imposition of civil liability where an arrest is concerned and provides no insight at all as to whether a mistake a of law can or cannot negate probable cause for an arrest.

Rather than decide the issue concerning Heien that is before the Court, relying primarily on Messerschmidt v. Millender, 565 U.S. 535 (2012), the Majority holds that "[t]he issuance of a warrant by a neutral issuing judge or judicial officer creates a strong presumption that it was objectively reasonable for officers to believe that there was probable cause[.]" Maj. Slip Op. at 39.  According to the Majority, "[i]n order to overcome the presumption of objective reasonableness that attaches to a warrant, the plaintiff must demonstrate that one or more of the *Leon* exceptions apply[.]"  Maj. Slip Op. at 39.  The Majority completes its holding by stating:

> In addition to the strong presumption of probable cause that attaches to a warrant, we also point out a separate basis from which an officer can reasonably believe that a warrant is supported by probable cause.  That is, when an officer obtains and follows legal advice from a prosecutor when applying for a statement of charges after presenting a full and fair disclosure

of everything that was presented to the officer, there is "further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause."

Maj. Slip Op. at 40 (citation omitted). I would not decide this case based on the Supreme Court's holding in Messerschmidt, when this was not the ground on which the circuit court granted summary judgment.

To be sure, on remand, Ms. Rovin amended her complaint and the State filed a new motion for summary judgment addressing whether the officers "could be liable based upon the probable cause determination made by the neutral judicial officer." Maj. Slip Op. at 23 n.19. Nonetheless, the fact remains that the circuit court concluded Heien applied and, based solely on that conclusion, the court granted summary judgment. The circuit court stated that it was of the opinion that the decision of the United States Supreme Court in Heien applied to the facts of the case and that "[a]ccordingly, neither Deputy Matthew Cook nor Sheriff Michael Lewis can be civilly liable for Plaintiff's arrest pursuant to a warrant based on a judicial officer's determination that probable cause existed[.]" The Majority omits critical language from the circuit court's ruling to give the impression that the circuit court granted summary judgment on a basis independent of the Supreme Court's holding in Heien. See Maj. Slip Op. at 23 n.19.[4] The circuit court did no such thing. Cases

_____

[4]The Majority also reads language in Ms. Rovin's brief out of context. The Majority states that "Ms. Rovin has squarely placed before us the issues of whether there was probable cause for her arrest and the validity of the warrant" by arguing in her brief that the "circuit court was also wrong in concluding that the warrant acted as an absolute shield against liability[.]" Maj. Slip Op. at 23-24 n.19 (alteration in original). In her brief in using this language, Ms. Rovin referred to this Court's determination in Rovin that the officers are not entitled to absolute immunity. Specifically, Ms. Rovin stated: "The circuit court

such as Messerschmidt, United States v. Leon, 468 U.S. 897 (1984), and Ashton v. Brown, 339 Md. 70, 660 A.2d 447 (1995), involving whether an officer made an objectively reasonable mistake as to probable cause, were not the basis on which the circuit court granted the State's motion for summary judgment on remand.[5]

When the circuit court's ruling was appealed to the Appellate Court of Maryland, in its brief, the State did not mention Messerschmidt. And, on brief in this Court, the State did not cite or mention Messerschmidt. But most importantly, in addition to the State not having cited Messerschmidt in the circuit court or later before the Appellate Court of Maryland or this Court, the circuit court did not rely on Messerschmidt as the basis for granting summary judgment on either occasion.

Messerschmidt, 565 U.S. at 543-44, 546, involved a civil action filed by occupants of a home that had been searched pursuant to a search warrant, alleging that "they were subjected to an unreasonable search in violation of the Fourth Amendment because the warrant authorizing the search of their home was not supported by probable cause." The

---

was also wrong in concluding that the warrant acted as an absolute shield against liability for arresting, imprisoning, and prosecuting Ms. Rovin. This Court already rejected the notion that the warrant provided absolute immunity to the officers in the prior appeal of this matter. *Rovin*, 472 Md. at 361."

[5]The State had filed a motion to dismiss or for summary judgment as to Counts I through VI of the amended complaint that Ms. Rovin filed on remand concerning false arrest, false imprisonment, malicious prosecution, violation of Article 24 of the Maryland Declaration of Rights, violation of Article 40 of the Maryland Declaration of Rights, and violation of Article 26 of the Maryland Declaration of Rights. The State filed an answer to Counts VII and VIII of the amended complaint—false light invasion of privacy and defamation. Because the circuit court's order granting the State's motion did not dispose of every claim in the case, namely, Counts VII and VIII, upon motion from Ms. Rovin, the circuit court certified its order for immediate appeal.

Supreme Court set forth the framework for determining whether the officers were entitled to immunity for damages, stating that "qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 546 (cleaned up). "Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Id. (cleaned up). The Supreme Court stated that, "[w]here the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in objective good faith." Id. (cleaned up). But, there is an exception "allowing suit when it is obvious that no reasonably competent officer would have concluded that a warrant should issue[,]" such as "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]" Id. at 547 (cleaned up).

The Supreme Court disagreed with the occupants' position that the officers failed to provide facts or circumstances from which a magistrate could conclude that there was probable cause to seize the items being sought and that no reasonable officer would have presumed that the warrant was valid. See id. at 548. The Supreme Court described the facts and concluded that, "[w]hether any of these facts, standing alone or taken together, actually establish probable cause is a question we need not decide. . . . The officers'

judgment that the scope of the warrant was supported by probable cause may have been mistaken, but it was not plainly incompetent." Id. at 553 (cleaned up). The Supreme Court continued: "On top of all this, the fact that the officers sought and obtained approval of the warrant from a superior and a deputy district attorney before submitting it to the Magistrate provides further support for the conclusion that an officer could reasonably have believed that the scope of the warrant was supported by probable cause." Id. (citation omitted). The Supreme Court determined that seeking guidance from a superior officer and a deputy district attorney was an additional circumstance supporting the conclusion that the officers could reasonably have believed that the scope of the warrant was supported by probable cause, not an independent basis or separate ground on which to conclude that the officers were entitled to qualified immunity. The Supreme Court stated: "The fact that the officers secured these approvals is certainly pertinent in assessing whether they could have held a reasonable belief that the warrant was supported by probable cause." Id. at 555.

Although the Majority correctly quotes Messerschmidt for the proposition that an officer's receipt of advice from a prosecutor after full and fair disclosure may further support the conclusion that the officer could reasonably have believed the scope of a warrant provided probable cause, the Majority prefaces this observation with the statement that this is a separate basis for an officer's belief that a warrant is supported by probable cause. See Maj. Slip Op. at 40. The Majority's statement that, "[i]n addition to the strong presumption of probable cause that attaches to a warrant, we also point out a separate basis from which an officer can reasonably believe that a warrant is supported by probable cause" is an expansion of the Supreme Court's holding in Messerschmidt. Maj. Slip Op. at 40.

- 10 -

The language used by the Majority appears to imply that <u>Messerschmidt</u> holds that an officer has a separate basis for immunity from civil liability where the officer makes a full and fair disclosure of information and receives advice from a State's Attorney and it is later determined that there was a mistake of law as to probable cause. However, the Supreme Court's holding <u>Messerschmidt</u> provides only that this would be a pertinent factor for consideration in its overall analysis. [6]

---

[6]To conclude that an officer has a separate basis for immunity from civil liability based solely on disclosure of information to a prosecutor and the receipt of advice from the prosecutor would be akin to a grant of absolute immunity of the type that the Supreme Court determined in <u>Malley v. Briggs</u>, 475 U.S. 335, 342-43 (1986), is not to be accorded in general to the conduct of law enforcement officers. In <u>Malley</u>, 475 U.S. at 342, 337, the Supreme Court rejected a law enforcement officer's contention that he was entitled to prosecutorial immunity and pointed out that, under the federal common law, only qualified immunity could attach to an officer's application for an arrest warrant.

Despite the Majority's protestation, concluding that an officer has a separate basis for probable cause that arises from the officer obtaining and relying upon a prosecutor's legal advice is in fact akin to concluding that where an officer consults with a prosecutor, an officer has absolute immunity. <u>See</u> Maj. Slip at 40. The Majority imposes no requirement that the advice given to the officer be objectively reasonable, which is the hallmark of qualified immunity, *i.e.*, that an officer is acting in a manner that is objectively reasonable. <u>See</u> <u>Messerschmidt</u>, 565 U.S. at 546-47. The Majority merely states that "[a]n officer who obtains and relies upon legal advice simply has a separate basis upon which the officer can reasonably believe that a warrant is supported by probable cause." Maj. Slip Op. at 40 n.29. In other words, according to the Majority, an officer who obtains and receives any type of legal advice at all from a prosecutor can reasonably believe that a warrant is supported by probable cause.

The Majority apparently conflates the principles set forth in Section 666 (Effect of Advice of Counsel) of the Restatement of Torts (1977) concerning the advice of counsel received by a lay person from an attorney with advice a law enforcement officer receives from a prosecutor. As a general principle of tort law, Section 666 provides that, where a "client" obtains the advice of an attorney, under certain conditions, the attorney's advice may be conclusive of the existence of probable cause for initiating criminal proceedings. Section 666 pertains to a "client" who receives advice from an attorney, not a law enforcement officer who receives advice from a prosecutor. Because Section 666 obviously does not address the circumstance of a law enforcement officer receiving advice

- 11 -

The Majority begins its discussion by stating that it will point out "key analytical principles that govern our consideration of the issues in the case." Maj. Slip Op. at 25. The Majority's first two "key analytical principles" are: (1) that this Court has consistently

from a prosecutor, *i.e.*, a non-attorney client relationship, the principle it discusses is not transferable. Section 666 and cases such as Gladding Chevrolet, Inc. v. Fowler, 264 Md. 499, 287 A.2d 280 (1972), and Kennedy v. Crouch, 191 Md. 580, 62 A.2d 582 (1948), do not pertain to law enforcement officers and predate the substantial body of law holding that law enforcement officers do not have absolute immunity.

This Court's holdings in Gill v. Ripley, 352 Md. 754, 724 A.2d 88 (1999), and Smith v. Danielczyk, 400 Md. 98, 928 A.2d 795 (2007), lead to the logical conclusion that the holding in Messerschmidt may not be interpreted to essentially provide absolute immunity to a law enforcement officer for simply following any advice received from a prosecutor. In Gill, 352 Md. at 770, 724 A.2d at 96, we concluded, "as a matter of Maryland common law, that prosecutors enjoy absolute immunity with respect to claims arising from their role in the judicial process—evaluating whether to commence a prosecution by criminal information, presenting evidence to a grand jury in the quest for an indictment, filing charges, and preparing and presenting the State's case in court." (Footnote omitted). In Rovin, 472 Md. at 357, 246 A.3d at 1213, we stated that, in so holding, "we identified prosecutors as the individuals in the judicial process for whom prosecutorial immunity is intended, and also listed examples of conduct to which prosecutorial immunity applies, *i.e.*, actions that only a prosecutor can take, such as presenting evidence to a grand jury when seeking an indictment." In Rovin, id. at 357, 246 at 1213, we concluded that the holding in Gill "does not support the notion that a law enforcement officer would be entitled to prosecutorial immunity" and that "prosecutorial immunity should not extend to law enforcement officers in the pursuit of law enforcement related activities, even where an officer consults with a prosecutor."

In Rovin, 472 Md. at 358, 246 A.3d at 1214, we stated that, in Smith, 400 Md. 98, 928 A.3d 795, this Court found persuasive the Supreme Court's holding in Malley as to a law enforcement officer not being entitled to prosecutorial immunity, explaining:

> In Smith [], 400 Md. [at] 103, 928 A.2d [at] 798 [], this Court held that a law enforcement officer is not entitled to absolute immunity from civil liability for making allegedly false, defamatory statements in an application for a search warrant and disclosing the statements to the media. This Court called Malley "instructive and persuasive," and agreed with the Supreme Court's determination that an officer's conduct in applying for a search warrant would not be entitled to absolute immunity. Smith, 400 Md. at 124-25, 928 A.2d at 811.

read State Constitutional rights *in para materia* with comparable rights under the Federal Constitution; and (2) that the facts supporting Ms. Rovin's common law claims and constitutional claims under Articles 24 and 26 are the same. Maj. Slip Op. at 25. Next, the Majority cites <u>Ashton</u> and states that the third "key analytical principle[]" is that "our case law makes clear, when considering whether a plaintiff has set forth a common law claim for false arrest, false imprisonment, or malicious prosecution, the test as to whether probable cause and legal justification exist in a particular case is judged by principles applicable to the law of arrest. *Ashton*, 339 Md. at 120; *Great Atl. & Pac. Tea Co. v. Paul*, 256 Md. 643, 655 (1970)." Maj. Slip Op. at 26. In doing so, the Majority inserts case law not raised by the State in the circuit court in <u>Rovin</u> or before this Court in <u>Rovin</u>. By identifying <u>Ashton</u> as setting forth a "key analytical principle[,]" the Majority begins its introduction of the new grounds on which it will decide that the circuit court properly granted summary judgment. <u>Ashton</u> is a case relied on by the State, in the circuit court on remand and in this Court, but it was not the basis of the circuit court's grant of summary judgment.

On brief in this Court, the State cites <u>Ashton</u> for the proposition that "[a]lthough no Maryland case directly addresses a mistake of law, the Court should apply the same reasonableness principles present in cases that consider reasonable mistakes of fact in arrests made pursuant to warrants." The State argues that applying <u>Ashton</u> to the question of a mistake of law as to probable cause is a question of first impression. Although this is an argument based on a different ground than the basis for the remand, unlike the Majority,

- 13 -

the State does not present <u>Ashton</u> as a basic or key existing principle of law on which this case should be decided on.[7]

At bottom, as a result of the Majority's holding affirming the grant of summary judgment on a ground not raised by the parties or relied on by the circuit court, *i.e.*, its holding based on <u>Messerschmidt</u>, we are now confronted with the same issue that existed in <u>Rovin</u>, before remand, with respect to the State's request that we affirm the grant summary judgment based on <u>Heien</u>. As this Court stated in <u>Rovin</u>, 472 Md. at 373, 246 A.3d at 1222, "[w]e must be cognizant of the general rule that in appeals from the granting of a motion for summary judgment, absent exceptional circumstances, Maryland appellate courts will only consider grounds upon which the lower court granted summary judgment." (Cleaned up). This Court has indicated two exceptions to the general rule, such as "that an appellate court may affirm on a different ground where the trial court would have had no discretion to deny summary judgment as to that ground" and "that an appellate court may affirm on a different ground where the two grounds are so interrelated that they cannot be properly considered as separate and distinct." <u>Id.</u> at 373, 246 A.3d at 1222-23 (cleaned up). In this case, neither exception applies or warrants affirming the circuit court's grant

---

[7]In <u>Ashton</u>, 339 Md. at 81-83, 93, 660 A.2d at 452-53, 458, which involved warrantless arrests of individuals for violating the City of Frederick's juvenile curfew ordinance, this Court concluded that the ordinance was facially unconstitutional and that, "[b]ecause of its vagueness, the ordinance violate[d] both the Due Process Clause of the Fourteenth Amendment and Article 24 of the Maryland Declaration of Rights." The individuals who had been arrested and detained sued for damages. <u>See</u> <u>id.</u> at 84, 96, 660 A.2d at 454, 460. We stated with respect to both an arrest made under a warrant and a warrantless arrest "legal justification to arrest may depend, in part, upon the arresting officer's good faith and reasonable belief in his authority to arrest." <u>Id.</u> at 120, 660 A.2d at 472 (citations omitted).

- 14 -

of the State's motion to dismiss or for summary judgment on different grounds than those the court relied on, namely, the application of Heien. This is not a situation in which a trial court had no discretion but to affirm nor is it a situation in which the ground on which the Majority affirms is interrelated with the ground on which the circuit court granted summary judgment.

Neither exception applies because the holding in Messerschmidt is vastly different from the Supreme Court's holding in Heien and from the circumstances of this case. Heien does not stand for the proposition that there is a strong presumption that law enforcement officers are immune from civil liability for claims brought against them where an officer makes an arrest pursuant to a warrant based on a mistake of law as to probable cause. As explained above, Heien involved an issue as to a law enforcement officer's mistake with respect to reasonable suspicion for a traffic stop, and, in this case, the State's attempt to use the case for the first time on appeal as a basis to support the grant of summary judgment. In grounding its holding on the logic of Messerschmidt, the Majority does not merely use a case in place of Heien that set forth the same principles. Instead of addressing the basis of the circuit court's grant of summary judgment, the Majority gives the State a second bite at the apple and decides the matter on grounds different than the circuit court did in originally granting summary judgment and different than the circuit court did in granting summary judgment on remand.

This case is in the troubling posture of having been remanded to the circuit court because this Court declined to affirm the grant of summary judgment on a ground not relied on by the circuit court and, after remand, this Court has affirmed the circuit court's grant

- 15 -

of summary judgment on a different ground not relied on by the circuit court.  In doing so, the Majority announces standards governing a law enforcement officer's immunity for a mistake of law with respect to probable cause for an arrest, and affirms a grant of summary judgment, without notice to or input from either party, or *amicus curiae* for that matter, concerning the case law it relied on because it saw "no reason" not to.  Maj. Slip at 24 n.19, 34 n.27.  This decision will be one of the most impactful decisions of this Court.

For the above reasons, respectfully, I dissent.